[Civ. No. 52226. First Dist., Div. Three. Aug. 22, 1983.]

CITY COUNCIL OF THE CITY OF SAN JOSE,
Plaintiff and Respondent, v.
KENT SOUTH, as Finance Director, etc., Defendant and Appellant.

**COUNSEL**

Robert K. Booth, Jr., and Wilson, Morton, Assaf & McElligott for Defendant and Appellant.

Harold E. Rogers, Jr., Peter D. Kelly, Arn H. Tellem, Peter J. Ross and Manatt, Phelps, Rothenberg & Tunney for Plaintiff and Respondent.

Jones, Hall, Hill & White and Robert G. Auwbrey as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

**FEINBERG, J.**—On October 6, 1982, this court filed and certified for publication an opinion in this cause in which we concluded that the judgment should be reversed. Thereafter and within due time a petition was filed for a rehearing of the cause by this court. We granted the petition.

The parties filed supplemental briefs. Every point involved in the controversy and every reason which could be conceived or suggested against the soundness of the conclusion to which we had been originally persuaded was examined, analyzed, and advanced with clarity and force.

We have concluded that our original decision was in error and we now affirm the trial court.

The principal issue on this appeal[1] is whether a nonvoted special assessment levied on an "estimated benefit" basis on real property within a maintenance district of the City of San Jose is: (1) an "ad valorem tax" limited by article XIII A, sections 1 and 4 of the California Constitution; or (2) "appropriations" or "proceeds of taxes" within the meaning of article XIII B of the California Constitution and subject to its limitations.

On June 6, 1978, the voters of this state adopted Proposition 13 (now art. XIII A of the Constitution), which placed limitations on the taxation powers of the state and local governments.

Following adoption of article XIII A, the City Council of the City of San Jose (collectively City), on May 15, 1979, adopted Ordinance No. 19651 amending chapter 6A of article II of the Municipal Code by adding a new part 14 which described the procedures for creating and funding maintenance districts. (San Jose Mun. Code, § 2600.194 et seq.) That ordinance was primarily patterned after the provisions contained in chapter 26 of the Improvement Act of 1911, "Maintenance Districts" (Sts. & Hy. Code, § 5820 et seq.). Under the 1911 state statute, assessments were levied on an ad valorem basis.

On July 3, 1979, pursuant to the provisions of Ordinance No. 19651, the City tentatively approved a resolution to establish Maintenance District No. 5A, a district composed of some 13 contiguous lots in an industrial park. The purpose of the district was to operate and maintain "landscaped median islands including plants, lawns, sprinklers, shrubs, water, power, labor,

---

[1]The appeal is from a judgment in favor of the City in a validation proceeding.

supervision and all other necessary works and applicances" on the public streets in the district.

As a response to the ad valorem taxation limitations prescribed by article XIII A, the City adopted a different method of levy. For district 5A assessments on a particular parcel were required to be made "in the *ratio that the area of each parcel* to be assessed for said costs of maintenance and operation *bear to the total area of all parcels* of property *within* said maintenance *district* to be assessed therefore [*sic*]." (Italics added.) Thus the assessment was levied proportionate to the "estimated benefit" that each parcel within the district would receive from the maintenance of the divider strips.

The estimated maintenance cost for the 1979-1980 fiscal year was $35,000. Under this "pro rata" formula each parcel was assessed a charge equivalent to $420.73477 per acre. There were no oral or written protests from the affected property owners to the creation of the maintenance district or to the levy of the special assessment. On July 17, 1979, the City formally adopted the resolution creating Maintenance District No. 5A.

In November 1979, the voters passed article XIII B of the California Constitution by initiative as Proposition 4. Article XIII B placed a limit on the growth of appropriations on the state and local level and prescribed procedures for returning to the taxpayers appropriations received in excess of the established limit.

On March 6, 1980, the City filed a petition for validation of Maintenance District No. 5A. Appellant Kent South, the City finance director, filed an answer challenging the creation of the Maintenance District No. 5A and the levy of assessment, contending that: (1) the general state statute relating to maintenance districts preempted the field and directed the City to levy assessments on an ad valorem basis; (2) the special assessment is an ad valorem tax subject to the limitations of section 1, and therefore, a "special tax" which must be approved by a two-thirds vote of the affected property owners as required by section 4, article XIII A; and (3) the special assessment levy is "an appropriation" subject to the limitation of article XIII B.

On October 21, 1980, the trial court specifically rejected each of the appellant's contentions and entered judgment in favor of the City. Appellant raises the same arguments on this appeal.

## I. *Preemption*

In support of his first argument, appellant asserts that the Improvement Act of 1911, specifically Streets and Highways Code sections 5821 and

5830, requires the City to levy special assessments on an ad valorem basis.[2] We disagree. As mentioned above, under the state statute special assessments were levied on an ad valorem basis. Nevertheless, the City was empowered under its "home rule" power to employ any method of levy it determined would equitably distribute the burden of payment among the affected property owners.

■ The City operated under a charter which provides for "home rule" pursuant to article XI, sections 3-7 of the California Constitution.[3] (See *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 60 [81 Cal.Rptr. 465, 460 P.2d 137].) Under the principle of "home rule" the City has the power to control and finance all "municipal affairs," without interference from gen-

---

[2]Streets and Highways Code section 5821 provides: "The *board* of supervisors *may,* in its resolution declaring its intention to order work done or improvements made or by separate resolution, declare its intention to order that the expenses of *maintaining and operating any or all of said improvements* or any or all other improvements such as are permitted to be constructed herein, including the cost of necessary repairs, replacements, fuel, power, electrical current, care, supervision, and any and all other items necessary for the proper maintenance and operation thereof, shall be assessed, either partly or wholly, *upon the real property or upon the land only lying within the district to be benefited by and to be assessed to pay the cost of the construction of said improvement,* or upon such district as the board of supervisors shall determine will be benefited by the maintenance and operation of the improvements proposed to be maintained; the amounts so assessed to be levied and collected in the same manner and by the same officers as taxes for county purposes are levied and collected." (Italics added.)

Streets and Highways Code section 5830 provides: "The board of supervisors shall thereafter, in each year, prior to the time of fixing the county tax rate, estimate the cost of maintaining and operating the improvements to be maintained and operated within the maintenance district during the ensuing year. The board of supervisors shall decide whether or not the cost of maintaining and operating the improvement shall be borne wholly or partially by the maintenance district and shall, in addition to all other taxes, fix a special tax rate for the real property within the maintenance district, or for lighting purposes levy an assessment on each parcel of real property within the maintenance district on the basis of the estimated benefit to the parcel, sufficient to raise an amount of money to cover the expense of maintaining the improvements during the ensuing year, or such portion of the amount as the board of supervisors shall determine shall be borne by the maintenance district, *and the board of supervisors shall levy a special assessment tax or, for lighting purposes, an assessment each year upon the real property in the maintenance district sufficient to pay such expense, or the portion thereof, which shall be paid by the maintenance district.*" (Italics added.)

[3]Section 200 of the City Charter provides: "GENERAL POWERS, the City of San Jose shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter and in the Constitution of the State of California. The City shall also have all other rights, powers and privileges which are not prohibited by, or in conflict with, the State Constitution or the Charter which it would be proper to specifically set forth in this Charter even though such are not herein set forth. It shall also have the power to exercise any and all rights, powers and privileges heretofore or hereafter established, granted or prescribed by any law of the State, by this Charter or by other lawful authority, or which a municipal corporation might or could exercise under the Constitution and laws of the State of California.

"The enumeration or specification in this Charter of any particular power shall not be held to be exclusive of or any limitation upon the generality of the foregoing provisions."

eral state laws and subject only to limitations contained in the state Constitution and the Charter itself. (Cal. Const., art. XI, § 5;[4] *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 224-225 [149 Cal.Rptr. 239, 583 P.2d 208]; *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 135 [98 Cal.Rptr. 281, 490 P.2d 793].)

■ Where, as here, there is a conflict between the state and the local legislation, the courts must decide whether the matter regulated is a state or a municipal affair. (See *Bishop* v. *City of San Jose, supra,* 1 Cal.3d at p. 62; *Alioto's Fish Co.* v. *Human Rights Com. of San Francisco* (1981) 120 Cal.App.3d 594, 603 [174 Cal.Rptr. 763], cert. den., 455 U.S. 944 [71 L.Ed.2d 657, 102 S.Ct. 144]; cf. *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 294 [32 Cal.Rptr. 830, 384 P.2d 158].)

■ It cannot be seriously disputed that the operation and maintenance of the landscaped median islands and their appurtenant areas is strictly of local interest. (See *Raisch* v. *Myers* (1946) 27 Cal.2d 773, 778-779 [167 P.2d 198]; *City of Redwood City* v. *Moore* (1965) 231 Cal.App.2d 563, 577-578 [42 Cal.Rptr. 72] [disapproved on other grounds in *Bishop* v. *City of San Jose, supra,* 1 Cal.3d at p. 63, fn. 6].) The instant improvements do not affect the regulation of traffic or communication. (See *Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 550, fn. 3 [183 Cal.Rptr. 73, 645 P.2d 124]; *Pac. Tel. & Tel. Co.* v. *City & County of S. F.* (1959).51 Cal.2d 766, 771-776 [336 P.2d 514].)

Appellant concedes that the *construction* of this improvement is a municipal affair, but asserts that the *ongoing maintenance* is not. Appellant fails to cite any cases upholding this distinction and we fail to see any logic to it. If the erection and operation of the improvement is deemed to be a municipal affair, a fortiori, its maintenance must also be a municipal affair. Further, both the state statutes and the city ordinance expressly permit the City to levy assessments for the *operation and maintenance* of the local improvements.

Accordingly, we find that the City was free to levy a "pro rata" special assessment for maintenance regardless of inconsistent provisions of the general state statute.

---

[4]Article XI, section 5, provides in pertinent part: "(a) It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. *City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith.*" (Italics added.)

## II. *California Constitution*

### *Article XIII A*

Appellant next argues that the voters intended to include special assessments on property within the limitation of ad valorem property taxes of article XIII A, sections 1 and 4.[5] Appellant relies on the ballot summary and the arguments and analyses in the ballot pamphlet to support this claim.

The City maintains that the special assessments levied on the basis of "estimated benefits" are materially different from ad valorem taxes and are not subject to limitation under sections 1 and 4 of article XIII A, Citing *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545 [169 Cal.Rptr. 391], and *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 777]. In *Solvang,* the city levied a special assessment to service and redeem assessment bonds used to create three public parking lots. In *Malmstrom,* the county levied assessments in order to service and redeem assessment bonds for local improvements under the Improvement Act of 1911 (Sts. & Hy. Code, § 5000 et seq.) and the Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.)

■■■ Both courts concluded that the special assessments were not ad valorem taxes within the meaning of article XIII A, sections 1 and 4. (*Solvang, supra,* 112 Cal.App.3d at pp. 550-557; *Malmstrom, supra,* 94 Cal.App.3d at pp. 981-982.) Relying principally on *Malmstrom,* the *Solvang* court reasoned that the "overriding concern of article XIII A was directed against general governmental spending and general real property taxes levied to finance such spending." (*Solvang, supra,* at p. 556; *Malmstrom, supra,* at p. 985.) Ad valorem taxes, the court concluded, are general taxes levied on all taxable property to pay for general expenditures. (*Solvang,· supra,* at p. 552; *Malmstrom, supra,* at p. 981.) In contrast, the court determined that special assessments are charges against property to pay for local improvements which specially benefit the affected property. (*Solvang, supra,* at pp. 552-553; *Malmstrom, supra,* at p. 981.)

---

[5]Section 1 provides: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties. [¶] (b) The *limitation provided for in subdivision (a) shall not apply to ad valorem taxes* or *special assessments* to pay the interest and redemption charges *on any indebtedness approved by the voters prior to the time this section becomes effective.*"

Section 4 provides: "Cities, Counties and special districts, *by a two-thirds vote of the qualified electors* of such district, *may impose special taxes* on such district, *except ad valorem taxes on real property* or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.)

In upholding the validity of California Constitution article XIII A in general, our Supreme Court recognized that the language of the article was "imprecise and ambiguous" in several respects. (*Amador Valley, supra,* 22 Cal.3d at p. 245; *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 201 [182 Cal.Rptr. 324, 643 P.2d 941].) ■ ■ ■ ■ One area of confusion is the meaning of the term "special assessment."[6]

,A. We turn first to article XIII A, section 1.

The incongruity is readily apparent when the two subdivisions of section 1 are read together: "(a) The maximum amount of any ad valorem tax on real property *shall not exceed one percent (1%)* of the full cash value of such property. *The one percent (1%) tax* to be collected by the counties and apportioned according to law to the districts within the counties. [¶] (b) The *limitation* provided for in subdivision (a) *shall not apply to* ad valorem taxes or *special assessments* to pay the interest and redemption charges on any indebtedness *approved by the voters prior to the time this section becomes effective.*" (Italics added.)

The confusion arises because of the use of the term "special assessments" in subdivision (b) but not in subdivision (a). ■ ■ ■ As discussed above, the *Solvang* and *Malmstrom* courts resolved this incongruity in favor of the governmental entity, concluding that a special assessment was wholly different from an ad valorem tax,[7] and therefore not within the one percent (1 percent) limitation. Thus the reference to "special assessments" in subdivision (b) was mere surplusage. (*Solvang, supra,* 112 Cal.App.3d at pp. 552-554; *Malmstrom, supra,* 94 Cal.App.3d at pp. 980-982.) We agree.

A question substantially identical to the City's maintenance levy, in the context of a maintenance levy for a flood control district in favor of the special assesssment was resolved in *American River Flood Control Dist.* v.

---

[6] "The generally accepted rules of construction for constitutional provisions may be summarized as follows: (1) a liberal, practical and common-sense approach should be taken; (2) the natural and ordinary meaning of the words used should be followed; (3) the apparent intent of the framers should be fulfilled and absurd results avoided; and (4) interpretations by the Legislature and administrative agencies and the ballot summary, arguments and analysis should be considered in determining the probable meaning of uncertain language. [Citation.]" (62 Ops.Cal.Atty.Gen. 254, 256 (1979); see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246.)

[7] Other significant differences between a special assessment and a tax include the following: (1) a special assessment can be levied only on land; (2) a special assessment cannot ordinarily be made a personal liability of the person assessed; (3) a special assessment is ordinarly based wholly on benefits; and (4) a special assessment is exceptional both as to time and locality. (*Northwestern etc. Co.* v. *St. Bd. of Equal.* (1946) 73 Cal.App.2d 548, at p. 552 [166 P.2d 917].)

*Sayre* (1982) 136 Cal.App.3d 347 [186 Cal.Rptr. 202].[8] Similar to the "estimated benefit" basis of the City's instant maintenance levy, the flood control district was divided into "zones of benefit" with each zone bearing a percentage of the maintenance costs proportional to the benefits each zone received. (*Id.*, at p. 352.) The legislation under which the flood control district operated allowed levies for improvements on maintenance.

The Third District relied on *Solvang Mun. Improvement Dist.* v. *Board of Supervisors, supra,* 112 Cal.App.3d 545, at pp. 552-554 as follows: ". . . a special assessment, sometimes described as a local assessment, is a charge imposed on particular real property for a local public improvement of direct benefit to that property, as for example a street improvement, lighting improvement, irrigation improvement, sewer connection, drainage improvement, or flood control improvement. *The rationale of special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. (Burnett* v. *Mayor etc. of Sacramento* (1859) 12 Cal. 76, 83-84.) The theory underlying special assessment is that *the local improvement,* such as the paving or lighting of a street, *directly benefits and increases the value of adjacent real property. . . . Although a special assessment is imposed through the same mechanism used to finance the cost of local government,* in reality *it is a compulsory charge to recoup the cost of a public improvement made for the special benefit of a particular property. . . .* [¶]*. . .* In sum, a special assessment is a charge levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement. . . ." (Pp. 552-554; italics added.)

The City's maintenance district levy provides for just such an assessment to be levied only against the lots in the district. The assessment is levied proportionate to the "estimate benefit" received by each parcel. We conclude that article XIII A, section 1 of the Constitution does not impinge on the City's authority to levy a special maintenance levy for district 5A. (*American River Flood Control Dist.* v. *Sayre, supra,* 136 Cal.App.3d 342, 347; *Solvang Mun. Improvement Dist.* v. *Board of Supervisors, supra,* 112 Cal.App.3d 545.)

Precisely because of the limited nature of the City's special maintenance district 5A, we cannot agree with appellant that "it could result in the wholesale avoidance of the purpose of article XIII A." Since special assessments like the instant one, traditionally require hearings and give prop-

---

[8]We do not agree with appellant that *Sayre* is distinguishable.

erty owners the opportunity to protest (San Jose Mun. Code, §§ 2600.196.5-.196.13 and 2600.197.3-.197.8), if the property owners do not want the proposed assessment, they will vote against it. Even though section 2600.197.8 of the city ordinance provides that a majority protest may be overruled by a four-fifths vote of the City Council, ". . . it is unlikely that local governments will continue with assessment proceedings once a majority of property owners in the proposed district have voiced their disapproval." (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, fn. 9 at p. 454 [170 Cal.Rptr. 232].)

Our view is supported by the Legislature's recent enactments (set forth, so far as pertinent, below)[9] that demonstrated that article XIII A does not limit the imposition of special benefit assessments.

B. We turn next to article XIII A section 4.[10]

In *Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d 197, our Supreme Court noted at page 205, that section 4 was "fundamentally undemocratic" and therefore construed it very strictly. In upholding the creation of a special transportation district sales tax by simple majority vote, the court held that the will of the majority of local voters would prevail over the two-third provisions of section 4 enacted by the voters of the state. (At p. 204.)

---

[9](1) By Statutes 1979, chapter 261, the Legislature, Government Code section 25210.77a, was amended to expressly permit a county to fix and collect charges for particular extended service "in proportion to the *estimated benefits* from such service received by each parcel." (Italics added; Stats. 1979, ch. 261, § 1, p. 902.) (2) Government Code sections 60400-60406, added by Statutes 1979, chapter 261, section 1.5, page 904, permitted the levy of an assessment for flood control services "*on the basis of estimated benefits*" (italics added); these sections were repealed by Statutes 1982, chapter 487, section 4, page 2100, and replaced with sections which permit benefit assessments (Stats. 1982, ch. 487, § 3, p. 2097); (3) Streets and Highways Code section 1550.4, added by Statutes 1979, chapter 261, section 2, page 905, permitted the levy of assessment for street lighting "*on the basis of estimated benefits*" (italics added). This section was repealed by Statutes 1982, chapter 487, section 7, page 2101, and replaced with the procedures set forth in Government Code section 54701 et seq. (Stats. 1982, ch. 487, § 13, p. 2102.) (4) By Statutes 1979, chapter 372, the Legislature enacted the "Parking and Business Improvement Area Law" (Sts. & Hy. Code, § 36500 et seq.) that provides for assessments on an "estimated benefits" basis. (5) By Statutes 1982, chapter 487, the Legislature enacted the "Benefit Assessment Act of 1982" (Gov. Code, § 54701 et seq.) permitting the levy, by simple majority vote of special benefit assessments for drainage, flood control and street lighting in an amendment "related to the benefit of the parcel [in the district which will be derived from the provision of the service]." (Gov. Code, § 54711, subd. (a).) Government Code section 54702 states that the Legislature finds and declares that "assessments imposed for the purpose of providing services *which benefit individual properties are not taxes* for the *general benefit of the governmental entity, but* are *assessments for services* which *confer special benefits* upon the properties to which the services are provided." (Italics added.)

[10]Quoted above at footnote 5 on page 328.

■ The special assessment for maintenance purposes is not a "special tax" within the meaning of section 4. "Special tax" as used in that section does not mean special assessment, but taxes levied for a specific purpose. (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, fn. 3 at pp. 53, 57 [184 Cal.Rptr. 713, 648 P.2d 935].)

Further, section 4 by its terms is restricted to taxes that can be "imposed" by the electoral process. Due process requirements (*Brookes* v. *City of Oakland* (1911) 160 Cal. 423, 431 [117 P. 433]; *Hoffman* v. *City of Red Bluff* (1965) 63 Cal.2d 584, 594 [47 Cal.Rptr. 553, 407 P.2d 857]), notice and the opportunity to be heard, which apply to special assessment, are not necessary for the imposition of a tax. (*Saunders* v. *Carr* (1968) 268 Cal.App.2d 10, 17-18 [74 Cal.Rptr. 147]; *American Co.* v. *City of Lakeport* (1934) 220 Cal. 548, 560 [32 P.2d 622].) In *Brookes, supra,* at p. 431, our Supreme Court held unconstitutional a statute that provided for the levy of an assessment by a vote of the qualified electors, as "the *constitutional requirement of due process of law is not fulfilled, unless there is provided a notice and an opportunity to be heard* to the property-owner, *upon the question whether or not his property is in fact benefited* by the improvement, *and whether or not it shall be, in effect, excluded from the district, although within its territorial limits.*" (Italics added.) Thus the elective processes do not apply to benefit assessments. (*Chase* v. *Kalber* (1915) 28 Cal.App. 561, at pp. 572-574 [153 P. 397]; *Alexander* v. *Mitchell* (1953) 119 Cal.App.2d 816, at p. 824 [260 P.2d 261]; *Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, at p. 836 [323 P.2d 71].) To construe section 4 to include special assessments would render it unconstitutional. We conclude that section 4 does not apply to the instant special assessment.

## C. Application of California Constitution Article XIII B.

■ Finally, appellant argues that the City's special assessment constitutes "proceeds of taxes" as defined by article XIII B and subject to its limitations.[11]

---

[11]Article XIII B provides in pertinent part:

"Sec. 1. The *total annual appropriations subject to limitation* of the state and of each local government *shall not exceed the appropriations limit* of such entity of government for the prior year adjusted for changes in the cost of living and population *except as otherwise provided in this Article*.

"Sec. 2. *Revenues* received by any entity of government in *excess of that amount* which is appropriated by such entity in compliance with this Article during the fiscal year *shall be returned* by a revision of tax rates or fee schedules within the next two subsequent fiscal years." (Italics added.)

"Sec. 8. . . . . . . . . . . . . . . . . . . . . .

"(b) 'Appropriations subject to limitation' of an entity of local government shall mean

Article XIII B was adopted less than 18 months after the addition of article XIII A to the state Constitution, and was billed as "the next logical step to Proposition 13," (art. XIII A). Article XIII A was generally aimed at controlling ad valorem property taxes and the imposition of new "special taxes." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 231-232 [149 Cal.Rptr. 239, 583 P.2d 1281]; *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d 974, 980 [156 Cal.Rptr. 777], see art. XIII A, §§ 1, 4.) The thrust of article XIII B, however, was toward placing certain limitations on the growth of appropriations at both the state and local governmental level; in particular, article XIII B places limits on the authorization to expend the "proceeds of taxes." (§ 8, subd. (c).)

Article XIII B provides that beginning with the 1980-1981 fiscal year, "an appropriations limit" will be established for each "local government." (§ 8, subd. (h).) No "appropriations subject to limitation" may be made in excess of this appropriations limit, and revenues received in excess of authorized appropriations must be returned to the taxpayers within the following two fiscal years. (§ 2.)

The appropriations limit for the 1980-1981 fiscal year is equal to the total "appropriations subject to limitations" for that entity in the 1978-1979 fiscal year, with certain adjustments for changes in the cost of living, population and financial responsibility for providing services. (§§ 3, 8, subd. (h); see Opns. Cal.Legis. Counsel, No. 15349 (Aug. 24, 1979) Gann Initiative, p. 4.) In succeeding years, the appropriations limit will be equal to the prior year's appropriations limit, subject to the specified adjustments. Appropriations limits may be changed by the voters, but not to exceed a period longer than four years.

"Billed as a flexible way to provide discipline in government spending, article *XIII B does not limit the ability to expend government funds collected*

---

any authorization to expend during a fiscal year the proceeds of taxes levied by or for that entity . . .;

"(c) '*Proceeds of taxes*' *shall include, but not be restricted to,* all tax revenues and the proceeds to an entity of government, from (i) regulatory licenses, user charges, and user fees to the extent that such proceeds exceed the costs reasonably borne by such entity in providing the regulation, product, or service, . . .

"(d) 'Local government' shall mean any city, county, city and county, school district, special district, authority, or other political subdivision of or within the state;

". . . . . . . . . . . . . . . . . . . . . . . . . .

"(h) The 'appropriations limit' of each entity of government for each fiscal year shall be that amount which total annual appropriations subject to limitation may not exceed under Section 1 and Section 3; provided, however, that the 'appropriations limit' of each entity of government for fiscal year 1978-79 shall be the total of the appropriations subject to limitation of such entity for that fiscal year." (Italics added.)

*from all sources.* Rather, the appropriations limit is based on 'appropriations subject to limitation,' which consists primarily of the authorization to expend during a fiscal year the 'proceeds of taxes.' (§ 8, subd. (a).) *As to local governments, limits are placed only on the authorization to expend the proceeds of taxes levied by that entity,* in addition to proceeds of state subventions (§ 8, subd. (c)); *no limitation is placed on the expenditure of those revenues that do not constitute 'proceeds of taxes.'"* (*County of Placer* v. *Corin, supra,* 113 Cal.App.3d 443, 447; italics added.)

Here, as in *Corin, supra,* the question is whether the special maintenance levy for the City's district 5A is within the meaning of "proceeds of taxes." We agree with the City that the proceeds of the special assessment are not "proceeds of taxes" and will not be included within its budgeted "appropriations subject to limitations."

In *Corin, supra,* the court explained at page 448: "Section 8, subdivision (c) defines ' "proceeds of taxes" ' as follows: ' "Proceeds of taxes," *shall include, but not be restricted to,* all tax revenues and the proceeds to an entity of government, from (i) regulatory licenses, user charges, and user fees to the extent that such proceeds exceed the costs reasonably borne by such entity in providing the regulation, product, or service, and (ii) the investment of tax revenues. . . . [¶] In summary, for local entities, 'proceeds of taxes' *includes, but is not restricted to:* (1) all tax revenues; (2) excessive regulatory license fees and excessive user charges and fees; (3) the investment of tax revenues; and (4) subventions from the state." (Italics added.)

In specifically rejecting the county's argument that special assessments (inter alia) while not included within the expressly enumerated categories of subdivision (c), were so similar in origin that they must be considered "proceeds of taxes," the *Corin* court relied on the *Malmstrom-Solvang* distinctions between "special assessments" and taxes, described above at pages 9-17.

Conceding (at p. 449) that the broader purpose of XIII B required a liberal construction, the court's conclusion is equally apt here: "Our analysis of article XIII B, section 8, subdivision (c), *compels* the conclusion that the *framers of the initiative did not intend to include the proceeds derived from special assessments to be included within the 'not restricted to' language of 'proceeds of taxes.'* While respondent correctly asserts that assessments are a function of the general power of taxation (*City of Baldwin Park* v. *Stoskus* (1972) 8 Cal.3d 536, 568 [105 Cal.Rptr. 325, 503 P.2d 1333]; see *Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683 [129 Cal.Rptr. 97, 547 P.2d 1377]; *Los Angeles Co. F.C. Dist.* v. *Hamilton* (1917) 177 Cal.

119, 130 [169 P. 1028]) 'there is a broad and well-recognized distinction between a tax levied for the general public good and without special regard to the benefit conferred upon the individual or property subject to the tax, and a special assessment levied to force the payment of a benefit, . . .' (*City Street Imp. Co.* v. *Regents Etc.* (1908) 153 Cal. 776, 778 [96 P. 801]; see *Inglewood* v. *County of Los Angeles* (1929) 207 Cal. 697, 702 [280 P. 360].)'' (Italics added.) (*Corin, supra,* at p. 449.)

Appellant concedes the holding of *Corin* but urges that like *Solvang* and *Malmstrom, Corin* was restricted to special assessments for local capital improvements as distinct from maintenance and relies on language from *Corin* at page 451, that ''to the extent that an assessment results in revenue above the cost of the improvement or is of general public benefit, it is no longer a special assessment but a tax.'' Nothing in the record supports this latter assertion. As to the attempted distinction between ''capital improvements'' and ''maintenance,'' *American River Flood Control Dist.* v. *Sayre, supra,* 136 Cal.App.3d 347, expressly dealt with an ongoing maintenance type of assessment. We hold that the City's special maintenance assessment did not constitute ''proceeds of taxes'' within the meaning of article XIII B.

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.