[No. A025928. First Dist., Div. Four. May 31, 1985.]

CITY OF LARKSPUR, Plaintiffs and Respondents, v.
MARIN COUNTY FLOOD CONTROL AND WATER CONSERVATION
DISTRICT et al., Defendants and Respondents;
TOWN OF CORTE MADERA et al., Interveners and Appellants.

948

COUNSEL

Susan Landon Marks and Bianchi, Hoskins, Stone, Paxton & Engel for Interveners and Appellants.

Joseph A. Forest for Plaintiffs and Respondents.

Douglas J. Maloney, County Counsel, and Allen A. Haim, Chief Deputy County Counsel, for Defendants and Respondents.

OPINION

**CHANNELL, J.**—In this case we are called upon to determine whether the Town of Corte Madera is obligated to contribute to the cost of completion of the Corte Madera Creek Flood Control Project, and whether the Marin County Flood Control and Water Conservation District can levy an assessment on property to fund completion of the project without prior voter approval. As will appear, we have determined that Corte Madera is so obligated, and that the district can levy an assessment for completion of the project without prior voter approval.

*Facts and Proceedings Below*

The facts are derived from the parties' agreed statements of facts below.

In 1953 the California Legislature adopted the Marin County Flood Control and Water Conservation District Act (the Act) (Wat. Code, Appen., ch. 68),[1] which established the Marin County Flood Control and Water Conservation District (district), consisting of all the territory lying within the exterior boundaries of the County of Marin. (*Id.*, § 68-2.) The Act provides for the establishment of zones within the district (*id.*, § 68-3), for the appointment of advisory commissions (*id.*, § 68-6.1), and for the determination of projects to be carried out for the benefit of the entire district or of one or more single zones (*id.*, § 68-10). Section 11 of the Act sets forth the procedures for the formation and amendment of zones and the institution of projects, and for objecting to any of these. (*Id.*, § 68-11.)

Following a study of the Corte Madera Creek basin by the United States Army Corps of Engineers, Congress authorized the Corte Madera Flood

---

[1]All further statutory references are to the Water Code, unless otherwise indicated.

Control Project (project) in the Flood Control Act of 1962. In 1965 the State Legislature enacted legislation adopting and authorizing the project in accordance with the Corps of Engineers' recommendation, and requiring the district to give assurances of local cooperation to the Corps of Engineers. (§§ 12734, 12735.)

On March 9, 1965, the district determined that the project required the establishment of a flood control zone which would include the Town of Corte Madera. Corte Madera consented to its inclusion within the zone, and on December 14, 1965, Zone 9 was established, including all land lying within the boundaries of Corte Madera.

On December 15, 1965, the district appointed five resident electors of Zone 9, including two residents of Corte Madera, to serve as members of the Zone Advisory Board of Flood Control Zone 9. On January 11, 1966, the district adopted the project for Zone 9. A revised project was approved two months later.

On February 9, 1967, the Town of Ross agreed to its annexation to the district. Thereafter the boundaries of Zone 9 were amended to include the Town of Ross and to establish the outer limits of Zone 9.

In 1966 and 1967 the district passed Resolutions No. 8861 and No. 9261 by which it agreed to and assured the Corps of Engineers that it would provide conditions of local cooperation for the project, and would provide all lands and easements and rights of way necessary for construction of the project.

On August 15, 1967, the United States Government, through the Corps of Engineers, and the District executed an agreement relative to the Corte Madera Creek Flood Control Project (the August agreement).[2] The parties originally contemplated that construction of the project would take place in three phases, known as Unit 1, Unit 2, and Unit 3. However, sometime after construction of the project was commenced, Unit 3 was divided into two units—Units 3 and 4—to be constructed in different building seasons.

Unit 1, which consisted of dredging the channel from San Pablo Bay to the Bon Air Bridge, was completed in 1967. Unit 2, which consisted of further channel dredging, construction of a concrete channel from the Bon Air Bridge to the College Avenue Bridge, and some work on Tamalpais Creek, was completed in 1969. Unit 3, extending the concrete channel from

---

[2]A copy of the August 15, 1967, agreement appears as an Appendix to this opinion.

the College Avenue Bridge to below the Ross Post Office, was completed in 1971. Since that time there has been no further work on the project.

Work on Unit 4 was initially scheduled to begin in 1972. However, construction of Unit 4 was delayed between 1972 and 1978 by litigation and by further environmental studies. In June 1978 the voters of California adopted article XIII A of the California Constitution, commonly known as Proposition 13. On November 7, 1978, Corte Madera, by the majority vote of its electorate, unilaterally withdrew from the district.

On March 29, 1982, the City of Larkspur and Benton A. Sifford, Jr. (hereinafter Larkspur), brought this action for declaratory relief and writ of mandate to compel the district to take all steps necessary to complete construction of Unit 4 of the project and to levy an assessment upon all properties located within Zone 9 of the district to fund the cost of such construction. By leave of court, the Town of Corte Madera and Robert L. Dunn (hereinafter Corte Madera) filed a complaint in intervention. Corte Madera asked for a declaration that it had lawfully withdrawn from the district and that the property owners within Corte Madera had no obligation in connection with district projects, and for a further declaration that the district could not impose a property assessment to fund construction of Unit 4 without first obtaining voter approval.

On December 6, 1983, the trial court entered judgment in favor of Larkspur and against Corte Madera and the district. The court determined (1) that the district has a legal obligation to take all necessary steps to complete Unit 4 of the project and to maintain the entire project; (2) that the district has the authority to levy a special assessment upon all of the property in Zone 9 and in Corte Madera for the completion and maintenance of the project, without obtaining prior voter approval; and (3) that the property owners of Corte Madera are under the same legal obligation as the property owners in Zone 9 to participate in the financial cost of the completion of Unit 4 and maintenance of the entire project. The court ordered that a Peremptory Writ of Mandate issue in accordance with its judgment. The court also ordered that the district levy an assessment on all property within Zone 9 and Corte Madera, in accordance with the method of assessment approved by the court, for the purpose of paying the local costs for completion of Unit 4.

Corte Madera appeals that portion of the judgment that (1) compels Corte Madera to share in the cost of construction of Unit 4 of the project, and (2) authorizes the levy of a special assessment on the property within Zone 9 and Corte Madera without prior voter approval. Corte Madera contends that

the vote of its electorate in 1978 to withdraw from the district relieves it of any financial obligation in connection with Unit 4, and that article XIII A of the California Constitution prohibits the levy of an assessment to complete the project without prior approval of two-thirds of the electorate.

## Discussion

### 1. *Corte Madera's Obligation*

Section 26.1 of the Act sets forth the procedures for withdrawal from the district and states the obligations of withdrawn territory as follows: "[T]he withdrawal of the area lying within the exterior boundaries of such city from the district shall not release the area so withdrawn from debts and obligations for or upon which it was liable or chargeable at the time such withdrawal was made; . . . ." (Appen., § 68-26.1.)

Corte Madera contends that construction of Unit 4 was not a chargeable debt or obligation of the district at the time of Corte Madera's withdrawal. This argument is meritless. The record shows that the district's obligation to provide for the completion of Unit 4 was established in 1967, and that it was reaffirmed in 1970 and again in 1972.

In Resolution No. 9261, passed by the district on March 28, 1967, the district agreed and assured the Corps of Engineers that it would provide conditions of local cooperation "for that reach of the authorized project extending from San Francisco Bay to the Intersection of Sir Francis Drake Boulevard and Corte Madera Creek in Ross near the City of San Anselmo . . . ." This resolution clearly contemplated construction through the Town of Ross.

Thereafter, in the August agreement, executed August 15, 1967, the district agreed, pursuant to Resolutions No. 8861 and No. 9261, to contribute 1.5 percent of the federal construction costs for the purposes of land enhancement, and to provide all lands, easements, rights of way, and disposal areas necessary for the construction of the project. Paragraph 2 of the agreement obligated the district to pay the government 1.5 percent of the costs of the construction of the "total project." Pursuant to Resolution No. 9261, the total project at that time expressly included construction through the Town of Ross.

Consequently, by adoption of Resolution No. 9261 and execution of the August agreement, the district in 1967 had assumed the obligation and legal

commitment to share in the costs of Unit 4.[3] This obligation was subsequently reaffirmed in 1970 by the adoption of Resolution No. 70-310,[4] and again in 1972 by the adoption of Resolution No. 72-5.[5]

■ Corte Madera contends, however, that even if the August agreement imposed an obligation on the district to share in the costs of construction of Unit 4, that obligation has become unenforceable because of a failure of consideration. Corte Madera premises this argument on the assertion that time, in the form of the specified construction schedule of the project,[6] was a material term of the agreement. Although Units 1, 2, and 3 were constructed on schedule, Unit 4, which was scheduled to commence construction in 1972, had been delayed six years when in 1978 Corte Madera withdrew from the district. Hence, any obligation to complete Unit 4 was unenforceable at that time.

In support of its argument, Corte Madera relies on paragraph 4 of the agreement, which states: "The parties hereto agree that the *current scheduled construction* for the Corte Madera Creek Project by the Government constitutes a good and valuable consideration for the payments required hereunder to be made by the Flood Control District to the Government and the Flood Control District by the execution hereof agrees and intends to create a legal binding and enforceable obligation for such payments." (Italics added.)

---

[3]In their Supplemental Agreed Statement of Facts the parties agreed that "Unit 4 is included as that part of the August 15, 1967, agreement which refers to current scheduled construction."

[4]Resolution No. 70-310, passed September 15, 1970, is specifically addressed to Unit 4 and provides in pertinent part: "WHEREAS, the Department of the Army, San Francisco District, Corps of Engineers, has undertaken the initial development of the Corte Madera Creek Flood Control project, which said project will extend from San Francisco Bay to Sir Francis Drake Boulevard, and to Shady Lane on Ross Creek, and [¶] WHEREAS, the Department of the Army has requested the District to provide the United States with such assurances as are necessary to program and initiate project construction for the next unit of work to be known as Unit 4; [¶] NOW, THEREFORE, BE IT RESOLVED that the Marin County Flood Control and Water Conservation District hereby unconditionally agrees to, and assures, the United States that it will: [¶] a. Provide, without cost to the United States, all lands, easements and rights of way including relocation of utilities, sewers, related and special facilities, required for construction of the project."

[5]In Resolution No. 72-5, adopted January 4, 1972, the district agreed and assured the United States that the project right of way would be available for the duration of the construction of Unit 4.

[6]The agreement does not refer to a construction schedule per se, but in estimating the amount of contribution costs required of the district, states that the estimated amount for fiscal year 1968 is $12,700, the estimated amount for the fiscal year 1969 is $16,500, and for fiscal year 1970 is $25,800. As indicated, sometime after the commencement of construction, Unit 3 was divided into two units—Units 3 and 4. Unit 4 was scheduled to commence construction in 1972.

Corte Madera's argument has superficial appeal. When, however, the phrase "current scheduled construction" is read in context of the entire agreement, it is apparent that the phrase refers not to a particular schedule of construction, but rather, to the units of the project that were scheduled to be constructed at the time of the agreement, as opposed to the upstream part of the Ross Valley unit that was not then scheduled for construction. Paragraphs 2 and 3 of the agreement illustrate the point.

Thus, paragraph 2 provides: "In connection with the required contribution for land enhancement, the Flood Control District agrees to pay to the Government 1.5% of the costs (including Government costs) of the construction of the total project, including 1.5% of the construction costs for completing the upstream part of the Ross Valley unit whether or not such unit is completed. . . ."[7] Paragraph 3 provides in pertinent part: "The upstream part of the Ross Valley unit *is not currently scheduled for construction.* . . . [I]f arrangements for completing the upstream part of the Ross Valley unit have not been made prior to completion of the *current scheduled construction,* payment of 1.5% of the construction costs of the remainder of the Ross Valley unit, estimated by the Government at the time of payment, will be paid by the Flood Control District to the Government at any time within but not later than 3 years from completion of the *current scheduled construction.*" (Italics added.) Thereafter, as indicated, the parties agreed in paragraph 4 that "the current scheduled construction," i.e., Units 1, 2, 3, and 4, constitutes "a good and valuable consideration for the payments required hereunder to be made by the Flood Control District," i.e., the payments for Units 1 through 4, plus the payments for the unscheduled upstream part of the Ross Valley unit, whether or not that unit is completed.

"*Delay* in performance is a material failure [of consideration] only if *time is of the essence,* i.e., if prompt performance is, by the express language of the contract or by its very nature, a vital matter. [Citations.]" (*Johnson v. Alexander* (1976) 63 Cal.App.3d 806, 813 [134 Cal.Rptr. 101] (italics in original).) Here, there is nothing in the agreement to suggest that if the "current scheduled construction" is not completed in keeping with the contemplated schedule, i.e., by 1970 (see fn. 6, *ante*), then the agreement will terminate. Because time thus is not of the essence of the agreement, the delay in completion of the construction of Unit 4 has not made the district's obligation to pay its share of the costs of the construction unenforceable.

---

[7]The parties agree that "the upstream part of the Ross Valley Unit" is not a reference to Unit 4, but rather, refers to flood control improvements to be placed beyond Unit 4, and that Unit 4 is included in the reference to "current scheduled construction."

Consequently, pursuant to section 26.1 of the Act (Appen., § 68-26.1), Corte Madera is obligated to pay its share of the costs of the construction and maintenance of Unit 4 notwithstanding its withdrawal from the district.

### 2. *Levy of Assessment*

Sections 5 and 12 of the Act authorize the district to levy ad valorem taxes or assessments for the purpose of paying any obligation of the district. (Appen., § 68-5, par. 11, § 68-12.) Before the adoption of article XIII A of the California Constitution, the district raised the funds necessary for the construction of Units 1, 2 and 3 of the project by the levy of an ad valorem tax on the real property located within Zone 9.

Article XIII A, adopted in 1978, limits the imposition of ad valorem taxes on real property to one percent of the value of the property and requires a two-thirds vote of the electorate to impose a special tax.[8] Larkspur contended below that notwithstanding the provisions of article XIII A, the district was empowered to levy a special assessment to fund the construction of Unit 4. Corte Madera argued that article XIII A prohibits the levy of a special assessment on real property within its boundaries without prior voter approval, because such property will not be specially benefited by the construction of Unit 4, as required for an assessment.

Case law has established that a special assessment to finance local improvements is not a general or special tax subject to the limitations of article XIII A, and that a local legislative body may levy an assessment free of the restrictions of the article. (E.g., *City Council* v. *South* (1983) 146 Cal.App.3d 320, 329-332 [194 Cal.Rptr. 110]; *American River Flood Control Dist.* v. *Sayre* (1982) 136 Cal.App.3d 347, 354-355 [186 Cal.Rptr. 202]; *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545, 556-557 [169 Cal.Rptr. 391]; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 982, 985 [156 Cal.Rptr. 777].) However, a special assessment, as distinguished from a general or special tax, requires

[8]Article XIII A provides in pertinent part as follows: "Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.

" . . . . . . . . . . . . . . . . .

"Section 4. Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

that the property assessed receive a special benefit from the improvement funded by the assessment. As stated in *Solvang Mun. Improvement Dist.*, *supra*, "[t]he rationale of special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. [Citation.] . . . . Although a special assessment is imposed through the same mechanism used to finance the cost of local government, in reality it is a compulsory charge to recoup the cost of a public improvement made for the special benefit of particular property. It has been said that, strictly speaking a special assessment is not a tax at all, but a benefit to specific real property financed through the use of public credit." (112 Cal.App.3d at pp. 552-553.)

In a Proceeding to Declare Certain Issues Without Substantial Controversy, the parties asked the court to determine whether the State Legislature's creation of a flood control district creates a conclusive presumption that the real property in the district will be specially benefited by the improvements. The court ruled that unless the enabling legislation has a provision making the question of benefit one for legislative determination (e.g., *Los Angeles Co. F. C. Dist.* v. *Hamilton* (1917) 177 Cal. 119, 124-125 [169 P. 1028]), the legislative enactment does not of itself establish a conclusive presumption of benefit. The court stated that although the Marin Act has no such provision, the Act has instead a specific provision for a hearing on the issue of benefit, i.e., section 11,[9] and that pursuant to section 11.1,[10] the provisions of section 11 are the exclusive method for determining the proper procedure for instituting projects under the Act.

The court then ruled: "The Town of Corte Madera and others interested in this flood project had an opportunity at the very onset to procure a determination of exclusion by reason of non-benefit. Having not done so,

[9]Section 11 of the Act provides that on resolution of the district board of supervisors to establish a zone or undertake a project, there must be held a noticed hearing at which the board considers the protests of any real property owner, or any public or quasi-public corporation, private corporation or unincorporated association. "Upon the hearing, the board may modify the boundaries of the proposed zone . . . by excluding therefrom any land which would not be benefited by inclusion in the zone; . . . . At the conclusion of the hearing the board may . . . proceed with the [proposed project] unless prior to the conclusion of said hearing a written protest against the proposed project or plan signed by a majority in number of the holders of title to real property . . . within such zone or . . . within the territory to be included in the proposed zone or within the territory to be added to or subtracted from a zone, be filed with the board, . . . ." (Appen., § 68-11, par. 2.)

[10]Section 11.1 of the Act provides: "The provisions of Section 11 of this act shall be exclusive in determining the proper procedure for the institution of projects under this act, any other provision of law notwithstanding." (Appen., § 68-11.1.)

having participated fully in the formation and operation of the project, and having received the advantages of the project as completed thus far, the Town and others interested have no means by which to litigate the absence of benefit issue. The hearing described in Section 11 of the Act was the exclusive procedure available for that purpose. [¶] From the foregoing, it can be said as a matter of law that: [¶] 'For the purposes of this proceeding, all of the property lying within flood control Zone 9 must be considered as receiving special benefit from the flood control facilities intended to be constructed by the Corte Madera Flood Control project.'"

Corte Madera contends that the court in effect ruled that the town is estopped to raise the special benefit issue because it failed to raise the issue when Zone 9 was formed. This ruling was error, the town argues, because estoppel requires that the party to be estopped be apprised of the facts (e.g., *Carty* v. *City of Ojai* (1978) 77 Cal.App.3d 329, 340 [143 Cal.Rptr. 506]; *Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 975 [137 Cal.Rptr. 699]). Yet when Corte Madera consented to its inclusion in Zone 9, the town asserts, the zone did not include Ross; hence, Corte Madera did not know, nor could it have known, that most of the costs of the construction of Unit 4 would be used to construct local improvements in Ross.[11]

The record refutes Corte Madera's claim of lack of knowledge. The record shows that Corte Madera's Resolution No. 797, consenting to the town's inclusion within Zone 9, was made effective only upon the adoption of similar resolutions in San Anselmo, Fairfax, *Ross,* and Larkspur. When Ross subsequently passed Resolution No. 780, consenting to its inclusion in the zone, the town conditioned its approval upon, inter alia, Zone 9 assuming responsibility for construction of local storm drain facilities within the Town of Ross. Thereafter, in Resolution No. 9260, the district Board of Supervisors (board) proposed to amend the boundaries of Zone 9 to include Ross and to establish the outer limits of the zone. Paragraph 3 of the resolution states that the intended annexation of Ross "is subject to all of the conditions set forth in the resolution of concurrence adopted by the Town of Ross on February 9, 1967, a copy of which is attached hereto as Exhibit 'B' and made a part hereof."

Hearing on Resolution No. 9260 was held on March 28, 1967. Pursuant to section 11 of the Act, the board was empowered at the hearing to modify

---

[11]At the time of trial the estimated cost to the district to complete Unit 4 was $735,000, of which approximately $500,000 would go to pay for flood control improvements within the Town of Ross.

the proposed boundaries of Zone 9 "by excluding therefrom any land which would not be benefited by inclusion in the zone." (Appen., § 68-11, par. 2. See also *id.*, § 68-3.) Notwithstanding notice that the annexation of Ross would obligate the district to construct local flood control improvements within the Town of Ross, Corte Madera did not object to the inclusion of Ross within the zone boundaries, nor did it seek its own exclusion from the amended zone.

We conclude, therefore, that the procedures set forth in section 11 of the Act afforded Corte Madera a full and sufficient opportunity to seek its exclusion from Zone 9 by reason of non-benefit, at a time when Corte Madera knew or should have known of the district's obligation to pay the costs of local improvements within the Town of Ross in connection with the construction of Unit 4 of the project. In the circumstances, section 11 was the exclusive procedure to assert lack of benefit.

The trial court correctly ruled that Corte Madera cannot now litigate the absence of benefit issue and that for the purposes of this proceeding the property within Zone 9 and Corte Madera must be considered as receiving special benefit from the flood control facilities heretofore constructed and intended to be constructed as Unit 4 in the project. Consequently, the district is empowered to levy an assessment on such property without prior voter approval.

The judgment is affirmed.

Poché, Acting P. J., and Sabraw, J., concurred.

### APPENDIX

#### AGREEMENT

THIS AGREEMENT, entered into this 15th day of AUGUST , 1967, by and between the UNITED STATES GOVERNMENT, hereinafter referred to as "Government", and the MARIN COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT, hereinafter referred to as the "Flood Control District",
#### WITNESSETH:
WHEREAS, Section 203 of the Flood Control Act of 1960 (PL 87-874) as amended by Section 204 of the Flood Control Act of 1966 (PL 89-789) provides among other things that local interests shall contribute in cash 1.5% of the total Federal construction costs of the

Corte Madera Creek Project for the purposes of land enhancement and provide without cost to the United States all lands, easements and rights-of-way necessary for the construction of the project, including suitable areas required for disposal of waste material as determined by the Chief of Engineers; and

WHEREAS, in connection with said project the Flood Control District has duly enacted Resolutions No. *8861* and *9261* which in part provided that the Flood Control District would contribute said 1.5% of the Federal construction costs for the purpose of land enhancement and would provide such lands, easements, and rights-of-way, and such disposal areas; and

WHEREAS, the Chief of Engineers has determined that perimeter diking of the disposal area being provided is necessary to make such area suitable for disposal of waste material.

NOW, THEREFORE, IT IS UNDERSTOOD AND AGREED by and between the parties hereto as follows:

1. The Flood Control District agrees to pay the costs (including Government costs) of diking the perimeter of the disposal area and upon the execution of this Agreement will pay to the Government the sum of $40,000 as the estimated cost of such work. As the exact costs are known, the $40,000 herein estimated may increase or decrease. In the event the costs are in excess of $40,000, the Flood Control District agrees to pay to the Government the additional amount required upon demand of the District Engineer of the San Francisco District, Army Corps of Engineers. In the event that the costs are less than $40,000, the difference between the actual costs and the $40,000 will be refunded to the Flood Control District.

2. In connection with the required contribution for land enhancement, the Flood Control District agrees to pay to the Government 1.5% of the costs (including Government costs) of the construction of the total project, including 1.5% of the construction costs for completing the upstream part of the Ross Valley unit whether or not such unit is completed. Payment of the 1.5% will be made incrementally at the start of each fiscal year based upon the estimated costs for that year. Such estimated amount will be paid at the start of the fiscal year on or about 1 July and will be subject to increase should it be determined by the District Engineer, San Francisco District, U. S. Army, Corps of Engineers, that additional funds will be necessary from the Flood Control District to meet the requirement for cash contribution of 1.5%. Such additional funds will be payable to the Government upon demand by the said District Engineer.

3. The estimated amount of contribution required for fiscal year 1968 is $12,700, and the Flood Control District agrees to pay that amount to the Government upon the execution of this Agreement. Based upon the estimated construction costs of current scheduled construction, the amount of contribution for the fiscal year 1969 is estimated at $16,500; and for the fiscal year 1970 at $25,800. The upstream part of the Ross Valley unit is not currently scheduled for construction. In the event that such work is subsequently scheduled for construction, the Flood Control District agrees to pay 1.5% of the estimated construction costs for each fiscal year such work is in progress as provided in paragraph 2 above. However, if arrangements for completing the upstream part of the Ross Valley unit have not been made prior to completion of the current scheduled construction, payment of 1.5% of the construction costs of the remainder of the Ross Valley unit, estimated by the Government at the time of payment, will be paid by the Flood Control District to the Government at any time within but not later than 3 years from completion of the current scheduled construction. The present estimated amount of this final payment is $55,000.

4. The parties hereto agree that the current scheduled construction for the Corte Madera Creek Project by the Government constitutes a good and valuable consideration for the payments required hereunder to be made by the Flood Control District to the Government and the Flood Control District by the execution hereof agrees and intends to create a legal binding and enforceable obligation for such payments.

[Signatures]