[Civ. No. 19620. Third Dist. Dec. 17, 1980.]

COUNTY OF PLACER, Petitioner, v.
F. EARL CORIN, as Treasurer, etc., Respondent.

COUNSEL

L. J. Dewald, County Counsel, Jones, Hall, Hill & White and Robert G. Auwbrey for Petitioner.

Orrick, Herrington, Rowley & Sutcliffe, John R. Myers and Carlo S. Fowler for Respondent.

OPINION

**CARR, J.**—In this mandate proceeding, the issue is whether "proceeds of taxes" as used in article XIII B of the California Constitution includes (1) special assessments of an assessment district and/or (2) federal grants made directly to a local entity for improvements within the assessment district. Petitioner, the County of Placer, seeks to compel respondent, who is the Placer County Treasurer, to serve notice of assessment on and to collect such assessments from property owners in the Tierra Heights Sewer Assessment District A-79.

In April 1979 petitioner's board of supervisors, pursuant to provisions of the Municipal Improvement Act of 1913 and the Improvement Bond Act of 1915, adopted a resolution entitled: A RESOLUTION OF INTENTION TO MAKE ACQUISITIONS AND IMPROVEMENTS—TIERRA HEIGHTS SEWER ASSESSMENT DISTRICT A-79. Petitioner had previously accepted a federal grant in the sum of $55,000 representing one-half the costs of making the required acquisitions and constructing improvements. On March 4, 1980, petitioner directed respondent to mail and serve appropriate notices to pay assessments to owners of real property within the sewer assessment district. Respondent has refused to serve and collect said assessments, asserting the proceeds thereof must be included within the appropriations limits set forth in article XIII B, section 1. We issued an alternative writ pursuant to our original authority, finding this question to be one of both first impression and substantial importance. (See *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 580 [131 Cal.Rptr. 361, 551 P.2d 1193]; *California Educational*

*Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 598 [116 Cal.Rptr. 361, 526 P.2d 513]; Cal. Civil Writs (Cont.Ed.Bar. 1970) § 85, p. 154.) Respondent by way of return has generally demurred to the petition contending a writ of mandate will not lie to compel performance of an illegal or unconstitutional act.

In November 1979 article XIII B was added to the California Constitution through the adoption of Proposition 4, commonly referred to as the "Gann Initiative." Ballot arguments in support of Proposition 4 referred to it as providing "permanent protection for taxpayers from excessive taxation" and "a reasonable way to provide discipline in tax spending at state and local levels."

Article XIII B was adopted less than 18 months after the addition of article XIII A to the state Constitution, and was billed as "the next logical step to Proposition 13" [article XIII A]. While article XIII A was generally aimed at controlling ad valorem property taxes and the imposition of new "special taxes" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231-232 [149 Cal.Rptr. 239, 583 P.2d 1281]; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 980 [156 Cal.Rptr. 777], see article XIII A, §§ (1), (4)), the thrust of article XIII B is toward placing certain limitations on the growth of appropriations at both the state and local government level; in particular, article XIII B places limits on the authorization to expend the "proceeds of taxes." (§ 8, subd. (c).)

Article XIII B provides that beginning with the 1980-1981 fiscal year, "an appropriations limit" will be established for each "local government."[1] (§ 8, subd. (h).) No "appropriations subject to limitation" may be made in excess of this appropriations limit, and revenues received in excess of authorized appropriations must be returned to the taxpayers within the following two fiscal years. (§ 2.)

The appropriations limit for the 1980-1981 fiscal year is equal to the total "appropriations subject to limitations" for that entity in the 1978-1979 fiscal year, with certain adjustments for changes in the cost of living, population and financial responsibility for providing services.

---

[1]Article XIII B is applicable to both the State of California and local governments. (See §§ 1, 8, subd. (a).) Since this action involves only a local government, i.e., the County of Placer, the operation of article XIII B as it relates to the state is not discussed.

(§§ 3, 8, subd. (h); see Ops.Cal.Legis. Counsel, No. 15349 (Aug. 24, 1979) Gann Initiative, p. 4.) In succeeding years, the appropriations limit will be equal to the prior year's appropriations limit, subject to the specified adjustments. Appropriations limits may be changed by the voters, but not to exceed a period longer than four years.

Billed as a flexible way to provide discipline in government spending, article XIII B does not limit the ability to expend government funds collected from all sources. Rather, the appropriations limit is based on "appropriations subject to limitation," which consists primarily of the authorization to expend during a fiscal year the "proceeds of taxes." (§ 8, subd. (a).) As to local governments, limits are placed only on the authorization to expend the proceeds of taxes levied by that entity, in addition to proceeds of state subventions (§ 8, subd. (c)); no limitation is placed on the expenditure of those revenues that do not constitute "proceeds of taxes." The intended scope of "proceeds of taxes," the source of a local government's "appropriations subject to limitations," is the pivotal issue herein.

Respondent contends the funds derived from the exercise of the power of assessment and from federal grant proceeds used to pay the costs and expenses of acquisitions and improvements, are encompassed within "proceeds of taxes" and must be included in the county's appropriations subject to limitation; that exclusion thereof and the making of other appropriations to the extent of petitioner's appropriations limit without regard to the existence of the authorization to expend these proceeds threatens to impair the validity and enforceability of said assessments and assessment bonds. Petitioner contends the proceeds of the special assessments and the federal grant do not constitute "proceeds of taxes," and will not be included within its budgeted "appropriations subject to limitation" for fiscal year 1980-1981.

This issue is one of substantial importance, involving the continued viability of provisions for initiating and completing special improvements. (See Sts. & Hy. Code, §§ 5000 et seq., 10000 et seq.) "For over 60 years these laws have provided the most widely used procedure in California for the construction of a variety of public improvements including streets, sewers, sidewalks, water systems, lighting and public utility lines; property owners benefited by the improvements pay for these improvements either in cash or, at their option, by installments over a period of time." (*County of Fresno v. Malmstrom, supra,* 94 Cal.App.3d at p. 978.) If local entities are required to include special

assessment and federal grant proceeds within their "appropriations subject to limitation," such entities will have to decide whether to limit or even discontinue the acquisition and improvement of local improvements or to finance such improvements from general tax revenues, i.e., at the expense of all taxpayers. In light of the enormous demands on reduced general tax revenues following adoption of article XIII A, the latter option appears fiscally unfeasible.

Section 8, subdivision (c) defines "'proceeds of taxes'" as follows: "'Proceeds of taxes' shall include, but not be restricted to, all tax revenues and the proceeds to an entity of government, from (i) regulatory licenses, user charges, and user fees to the extent that such proceeds exceed the costs reasonably borne by such entity in providing the regulation, product, or service, and (ii) the investment of tax revenues. With respect to any local government, 'proceeds of taxes' shall include subventions received from the state, other than pursuant to Section 6 of this Article and, with respect to the state, proceeds of taxes shall exclude such subventions."

In summary, for local entities, "proceeds of taxes" includes, but is not restricted to: (1) all tax revenues; (2) excessive regulatory license fees and excessive user charges and fees; (3) the investment of tax revenues; and (4) subventions from the state.

Respondent asserts that special assessment and federal grants proceeds, though not included within any of the expressly enumerated categories in section 8, are similar in origin and character to user charges and user fees and are of the same general class; that federal grant proceeds are akin to state subventions: and under the doctrine of *ejusdem generis*,[2] must be considered "proceeds of taxes," as the latter includes but is not restricted to tax revenues, certain regulatory and user fees and charges, and state subventions.

---

[2]In its practical application, this rule simply means that "'general and specific words which are capable of an analogous meaning, being associated together, take color from each other, so that the general words are restricted to a sense analogous to the less general.' (3 Words and Phrases Judicially Defined, p. 2328.) ... [Thus,] 'where a statute or other document enumerates several classes of persons or things, and immediately following and classed with such enumeration the clause embraces "other" persons or things, the word "other" will generally be read as "other such like," so that persons or things therein comprised may be read as *ejusdem generis* with, and not of a quality superior to or different from, those specifically enumerated.'" (*People* v. *Strickler* (1914) 25 Cal.App. 60, 64, 65 [142 P. 1121].) *Ejusdem generis* is a rule of construction used to carry out, not to defeat, the legislative intent.

Further, respondent notes that article XIII B was intended both to carry out the intent and to extend the scope of article XIII A. While article XIII A was aimed at controlling ad valorem property taxes and imposition of new special taxes (see *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at pp. 980-984,), article XIII B is directed at controlling government spending. (See §§ 1, 8, subd. (a), (b) (c).) The source of revenue to be spent is not limited to property taxes; "all tax revenues" are subject to the limitations of article XIII B, in addition to certain user and regulatory charges, state subventions, and the investment of tax revenues. (§ 8, subd. (c).) Respondent urges it is our duty to give article XIII B a broad, liberal interpretation in accordance with the will of the people (see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245),[3] and this mandates a finding that special assessment and federal grant proceeds were intended to be included within the "not restricted to" provision of "proceeds of taxes."

Our analysis of article XIII B, section 8, subdivision (c), compels the conclusion that the framers of the initiative did not intend to include the proceeds derived from special assessments to be included within the "not restricted to" language of "proceeds of taxes." While respondent correctly asserts that assessments are a function of the general power of taxation (*City of Baldwin Park* v. *Stoskus* (1972) 8 Cal.3d 563, 568 [105 Cal.Rptr. 325, 503 P.2d 1333]; see *Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683 [129 Cal.Rptr. 97, 547 P.2d 1377]; *Los Angeles Co. F.C. Dist.* v. *Hamilton* (1917) 177 Cal. 119, 130 [169 P. 1028]) "there is a broad and well-recognized distinction between a tax levied for the general public good and without special regard to the benefit conferred upon the individual or property subject to the tax, and a special assessment levied to force the payment of a benefit,..." (*City Street Imp. Co.* v. *Regents Etc.* (1908) 153 Cal. 776, 778 [96 P. 801]; see *Inglewood* v. *County of Los Angeles* (1929) 207 Cal. 697, 702 [280 P. 360].)

---

[3]"The generally accepted rules for construing constitutional provisions may be summarized as follows: (1) a liberal, practical and common-sense approach should be taken, (2) the natural and ordinary meaning of the words used should be followed, (3) the apparent intent of the framers should be fulfilled and absurd results avoided, and (4) interpretations by the Legislature and administrative agencies and the ballot summary, arguments and analysis should be considered in determining the probable meaning of uncertain language. [Citation.]" (62 Ops.Cal.Atty.Gen. 254, 256 (1979); see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246.)

Taxes are levied by the Legislature, or by counties and municipalities under their delegated power, for the support of the state, county, or municipal government (*Taylor* v. *Palmer* (1866) 31 Cal. 240, 251-252; 51 Cal.Jur.3d, Public Improvements, § 2, p. 563; 70 Am.Jur.2d, Special or Local Assessments, § 1, pp. 842-843.) Special or local assessments, on the other hand, are imposed on property within a limited area for payment of a local improvement allegedly enhancing the value of the property taxed (*Northwestern Etc. Co.* v. *St Bd. Equal.* (1946) 73 Cal. App.2d 548, 552 [166 P.2d 917]; see *City of Los Angeles* v. *Offner* (1961) 55 Cal.2d 103, 108 [10 Cal.Rptr. 470, 358 P.2d 926].) Special assessments can be levied only on the specific property benefited and not on all the property in the district. (*Anaheim Sugar Co.* v. *County of Orange* (1919) 181 Cal. 212, 216 [183 P. 809]; see *City of Baldwin Park* v. *Stoskus, supra*, 8 Cal.3d at p. 568.)[4]

In *County of Fresno* v. *Malmstrom, supra*, 94 Cal.App.3d 974, the question presented was whether special assessments were "special taxes" within the provisions of article XIII A. While noting that the terms "tax," "special tax," and "special assessment" have at times become hopelessly entangled in judicial opinions, legislative and legal treatises, the *Malmstrom* court recognized and followed the long standing precedent that strictly speaking, special assessments are not taxes at all. (*Id.* at pp. 982-983,; see also *Cedars of Lebanon Hosp.* v. *County of L.A.* (1950) 35 Cal.2d 729, 747 [221 P.2d 31, 15 A.L.R.2d 1045]; *Los Angeles Co. F.C. Dist.* v. *Hamilton, supra*, 177 Cal. at p. 129; *County of Santa Barbara* v. *City of Santa Barbara* (1976) 59 Cal.App.3d 364, 379-380 [130 Cal.Rptr. 615]; *County of San Bernardino* v. *Flournoy* (1975) 45 Cal.App.3d 48, 51-52 [117 Cal.Rptr. 732].)[5]

In *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545 [169 Cal.Rptr. 391], the court adopted the reasoning

---

[4]Significant differences between a special assessment and a tax include the following: (1) a special assessment can be levied only on land; (2) a special assessment cannot ordinarily be made a personal liability of the person assessed; (3) a special assessment is ordinarily based wholly on benefits; and (4) a special assessment is exceptional both as to time and locality. (*Northwestern Etc. Co.* v. *St. Bd. of Equal., supra*, 73 Cal.App.2d at pp. 551-552.)

[5]The *Malmstrom* court analogized assessments as being "more in the nature of loans to property owners for improvements benefiting their property, with bonds representing that loan and secured by the property itself." (94 Cal.App.3d at p. 980, fn. 2.)

of the *Malmstrom* court in determining special assessments levied to benefit specific properties within a specified district were not includable in the 1 percent of assessed value limitation imposed on ad valorem taxes by article XIII A, section 1 of the California Constitution. The problem in *Solvang, supra,* resulted from an incongruity in the language of subdivisions (a) and (b) of section 1. Subdivision (a) imposed the 1 percent limitation on ad valorem taxes. Subdivision (b) exempted from the 1 percent limitation ad valorem taxes or special assessments to pay interest and redemption charges on indebtedness approved by the voters prior to the effective date of article XIII A. At issue were nonvoted special assessments for a public parking district created pursuant to general and special statutory authority. Bonds were issued and special assessments to pay the principal and interest were levied annually by the board of supervisors against the benefited properties. The board interpreted article XIII A, section 1 to prohibit such assessment. The court first determined such an application of article XIII A would retroactively deprive the bondholders of their contractual right to repayment and such impairment of contract was constitutionally impermissible. Next, the court decided that special assessments designed to directly benefit the property assessed and make it more valuable were not within the 1 percent limitation and the reference to "special assessments" in section 1, subdivision (b) was mere surplusage.

Under article XIII B, with the exception of state subventions, the items that make up the scope of "'proceeds of taxes'" concern charges levied to raise *general revenues* for the local entity. "'Proceeds of taxes,'" in addition to "all tax revenues" includes "proceeds...from... regulatory licenses, user charges, and user fees [*only*] *to the extent that such proceeds exceed the costs reasonably borne by such entity in providing the regulation, product or service....*" (§ 8, subd. (c)) (Italics added.) Such "excess" regulatory or user fees are but *taxes* for the raising of general revenue for the entity. (*City of Madera* v. *Black* (1919) 181 Cal. 306, 313-314 [184 P. 397]; see *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 661-663 [166 Cal.Rptr. 674]; *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263].) Moreover, to the extent that an assessment results in revenue above the cost of the improvement or is of general public benefit, it is no longer a special assessment but a tax. (*City of Los Angeles* v. *Offner, supra,* 55 Cal.2d at pp. 108-109.) We conclude "proceeds of taxes" generally contemplates only those impositions which raise general tax revenues for the entity.

We find support for this position in the ballot arguments in favor of the initiative,[6] which assert that: Proposition 4 will provide "permanent constitutional protection for *taxpayers* from excessive *taxation*;" "will refund or credit excess *taxes* received by the state to the taxpayer;" "will curb *excessive* user fees [which are akin to taxes] imposed by local government;" "will eliminate waste by forcing politicians to rethink priorities while spending our *tax* money." (Italics added.) Finally, the argument states "Your 'yes' vote will guarantee that excess state *tax* surpluses will be returned to the taxpayer. . . ." and "[T]his amendment is a reasonable and flexible way to provide discipline in *tax* spending at the state and local levels. . . ." (Italics added.) In both its supportive and interpretative language, the thrust of article XIII B is directed at limiting *tax* revenues and appropriations.

Respondent's analysis of the similarities between taxes, user charges, and special assessments is not persuasive that special assessment proceeds were intended to be included within the "not restricted to" clause of "proceeds of taxes." Special assessments are *not* taxes, and are *not* levied for general revenue purposes. We are unable to find anything in article XIII B to indicate that "proceeds of taxes" were intended to include special assessment proceeds. The doctrine of *ejusdem generis* cannot be used to include within the category of "proceeds of taxes" something that is not a tax and which was clearly not intended to be included.[7]

---

[6]Ballot arguments and analyses presented to the electorate may be considered in determining the probable meaning of an initiative's uncertain language. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra*, 22 Cal.3d at pp. 245-246.)

[7]Respondent's position appears to be that: (1) although *Malmstrom* found that the provisions of article XIII A were not applicable to special assessments, (2) since article XIII B was designed to carry at and broaden the scope of article XIII A, that (3) special assessment proceeds must have been intended to be included within the parameters of article XIII B.

It is true that article XIII B is broader and more encompassing that its precedessor. Unlike article XIII A, article XIII B is not limited to ad valorem taxes and the imposition of new special taxes; rather, article XIII B is addressed to "all tax revenues," including those derived from the imposition of "excess" regulatory and user charges. (Cf. art. XIII A, §§ 1, 4, with art. XIII B, § 8, subd. (c).) Article XIII A did not address the issue of either state subventions or proceeds derived from the investment of tax revenues. Nor did article XIII A place a ceiling on the expenditures of these tax proceeds or require that excess tax revenues be returned to the electorate. But the fact that article XIII B is a more encompassing plan to limit government spending does not compel the conclusion that "proceeds of taxes" was meant to include special assessment proceeds. Article XIII B is directed at limiting the appropriation of tax revenues; special assessments *are not taxes*, are not raised for the general public welfare, and do not provide general revenues for local entities.

In finding that proceeds derived from the power of assessment were not intended to be included within the provisions of article XIII A, the *Malmstrom* court made the following observation: "Respondent's construction would place local government entities in a rather precarious situation by forcing them into a Hobson's choice of spending general tax funds either for expenditures to benefit the public at large or for projects to benefit certain individual property owners by funding improvements such as the construction of streets, sidewalks, gutters and sewers. *Inherent in the concept of special assessments is the fact that certain property owners receive special benefits.* [Citations.] *It would not be just to the general taxpayers of the political entity to use general funds to pay for such special benefits to a few property owners.* [Citation.]" (*County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 981: italics added.)

This analysis is consistent with our interpretation of the intended scope of article XIII B. With only a limited fund from which to spend for general public services *and* special benefit improvements, local entities would be forced into a "Hobson's choice" of limiting or discontinuing general improvements and services for the benefit of the many in order to provide a local area with special benefit improvements for the few. The alternative would be for local areas to do without essential services, such as sewers, water, etc., so that the local government could be assured of remaining within its appropriations limit.

Reference to the ballot arguments in favor of article XIII B demonstrates that no such "Hobson's choice" was intended. Said arguments assert "[t]his measure... WILL NOT prevent state and local governments from providing essential services.... [¶] WILL NOT favor one group of taxpayers over another." (Emphasis in original.) Each of these arguments is valid only if we conclude that special assessment proceeds were not intended to and do not come within the parameters of "proceeds of taxes; otherwise, for practical purposes, local governments would be deprived of the ability to fund the construction of major improvements for a particular area within their jurisdiction. (*County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 981.)[8]

---

[8]Moreover, "[w]here the Legislature has enacted a law in light of a particular constitutional provision, a settled rule of construction is that the Legislature's interpretation of uncertain constitutional terms is entitled to great deference by the courts." (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 662 [166 Cal.Rptr. 674].) Following the adoption of article XIII B, the Legislature enacted Senate Bill No. 1389, signed into law on July 16, 1980, as an urgency measure effective immediately. (Gov. Code,

Respondent's assertion that article XIII B was designed to close the loopholes created by article XIII A is without merit.

The use of the special assessment process to construct and improve needed services can hardly be considered a loophole to the provisions of article XIII A. (See 62 Ops.Cal.Atty.Gen. 663, 669 (1979).) Special assessments are one of the oldest used methods for the longterm financing of public improvements. (See *County of Fresno v. Malmstrom, supra,* 94 Cal.App.3d at p. 978; Hamilton, Guide To California Special Assessment Acts (1966), p. 1; Nichols, *Comment: How Not to Contest Special Assessments in California* (1965) 17 Stan.L.Rev. 247, 247-248.) Special assessments, being levied only for improvements that benefit particular parcels of land, and not to raise general revenues, are simply not the type of exaction that can be used as a mechanism for circumventing these tax relief provisions. (See 62 Ops.Cal.Atty.Gen. 663, 669 (1979).)[9]

Petitioner accepted a $55,000 federal grant representing one-half of the cost of making acquisitions and constructing improvements in the

§ 53715, added by Stat. 1980, ch. 516, § 1.) Government Code section 53715, added by Senate Bill No. 1389, provides in part: "As used in Article XIII B of the California Constitution, the term 'proceeds of taxes' *does not include* the proceeds from the sale of bonds, notes, warrants or other obligations required for the purpose of financing or refinancing the acquisition, construction, or completion of public improvements or projects or any rents, charges, assessments, or levies, other than tax levies, made pursuant to law, the proceeds of which are required for the payment of principal and interest, or to otherwise secure such obligations, and to pay the costs and expenses associated therewith." (Italics added.)

[9]Neither is the addition of Articles XIII A and XIII B likely to cause a sudden shift to the use of special assessments *unless said improvements are both needed and desired by those property owners who will pay for such improvements.* Unlike other governmentally imposed burdens, taxes in particular, the various special assessment acts have traditionally and continue to require that one or more hearings by the legislative body be held prior to confirmation and levy of the assessment. (See e.g., Sts. & Hy. Code, §§ 5130-5227, 5360-5375, 10300-10350.) Thus, special assessments are not the type of exaction that can be imposed without giving the affected property owners both notice and opportunity to be heard. In addition, most special assessment acts contain provisions for a "majority protest." (See e.g., Sts. & Hy. Code, §§ 5220-5222, 10310-10312.) A majority protest exists if written protests are made by owners of more than one-half of the area of the property to be assessed. (See Sts. & Hy. Code, § 2930.) Such a protest compels abandonment of the proceedings and precludes similar proceedings for one year. (Sts. & Hy. Code, § 2930; but see Sts. & Hy. Code, § 2932.) While majority protests may be overruled in certain instances (e.g., Sts. & Hy. Code, §§ 2932, 5222, 10311), it is unlikely that local governments will continue with assessment proceedings once a majority of property owners in the proposed district have voiced their disapproval.

Tierra Heights Sewer Assessment District. Respondent argues since "proceeds of taxes" includes state subventions, and as federal grants are similar in nature to such subventions, the doctrine of *ejusdem generis* requires that federal grant proceeds be considered "proceeds of taxes." We disagree.

"Subventions" as used in article XIII B is defined as a "subsidy" or "assistance or support" from the state to local government. (Ops.Cal. Legis. Counsel, No. 14076 (July 20, 1979) Gann Initiative, p. 2.) The federal grant at issue was made directly from the federal government to the County of Placer; we do not have state action or subvention in its usual form.

Nor can we conclude that federal grants proceeds were intended to be encompassed within "proceeds of taxes." Federal grants are not mentioned in either article XIII B or in the ballot arguments in support thereof.

Of greater significance, however, is that construing federal grants to be within the scope of "proceeds of taxes" would in no way further the spending and taxing limit objectives of article XIII B. Unlike state subventions, which if not taken and spent will result in a refund of taxes and thus an indirect tax reduction under article XIII B, federal grants not taken and spent will not give rise to any tax refund; in fact, the opposite will occur. Federal grants return tax monies to California when such grants are accepted. It is unlikely that local governments would be able to accomodate both special assessment proceeds and matching federal funds within the entity's budgeted "appropriations subject to limitation," thereby forcing such entities to reject offers of federal funds. In turn, to refuse to accept such grants would require that area improvements be financed exclusively by local governments and would tend to increase taxes in the long range. This result is in no way consistent with the objectives of article XIII B.

We determine that article XIII B does no more than place a ceiling on the expenditure of general state and local tax revenues and does not encompass special assessments and federal grants of the kind before us in the case at bench.

Let a peremptory writ of mandate issue commanding respondent to mail appropriate notices of assessment on and collect such assessments

from the owners of real property in the Tierra Heights Sewer Assessment District A-79 as provided by law.

Regan, Acting P. J., and Evans, J., concurred.