[No. E006999. Fourth Dist., Div. Two. Dec. 23, 1992.]

RICHARD J. RIDER et al., Plaintiffs and Respondents, v. COUNTY OF SAN DIEGO et al., Defendants and Appellants.

**COUNSEL**

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Bruce D. MacLeish and Andrew J. Freeman, Deputy County Counsel, McDougal, Love, Eckis & Grindle, Lynn R. McDougal and Tamara A. Smith for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Jack T. Kerry, Deputy Attorneys General, John W. Witt, City Attorney (San Diego), C. Alan Sumption, Chief Deputy City Attorney, and Leslie J. Girard, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Appellants.

Louis S. Katz, Gregory Marshall, Carl Fabian, Ellen D. Geis, Stephen J. Perrello, Jr., and Lewis A. Wenzell for Plaintiffs and Respondents.

Ronald A. Zumbrun, Anthony T. Caso and Alan W. Foutz as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

HOLLENHORST, J.—

PRELIMINARY STATEMENT OF FACTUAL
AND PROCEDURAL BACKGROUND

We are here concerned with certain collateral issues raised in the context of a "validation action" brought by a consortium of interested persons (hereinafter, the Taxpayers) pursuant to section 863 of the Code of Civil Procedure to challenge the validity of a ½ of 1 percent (0.5 percent) supplemental retail transaction and use tax imposed throughout the County of San Diego to finance the construction and operation of criminal detention and/or courthouse facilities in that county (hereinafter, the supplemental sales tax). The primary defendants in the action are the County of San Diego (hereinafter, the County) and the San Diego County Regional Justice Facility Financing Agency (hereinafter, the Agency).

This is the second time this case has come before us. During the initial phase of the instant litigation, we were called upon to determine the substantive merit of the Taxpayers' contention that the supplemental sales tax was invalid as being violative of article XIII A, section 4 of the California Constitution. We concluded that the supplemental sales tax was valid and reversed the trial court in that regard. As a consequence, we found it unnecessary to review certain collateral issues decided by the trial court— issues such as an award of attorney fees to the Taxpayers' attorneys under section 1021.5 of the Code of Civil Procedure and an ordered "redistribution" of the invalidly collected tax funds by way of a temporary "sales tax offset." On subsequent review of our determination as to the validity of the supplemental sales tax, our Supreme Court reversed this court—concluding that the supplemental sales tax was invalid as being violative of article XIII A, section 4 of the California Constitution. (*Rider v. County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000], hereinafter referred to simply as *Rider I.*)

In *Rider I*, our Supreme Court observed that: "The Agency, the County, and some amici curiae, including the State Board of Equalization, have raised on appeal several additional issues regarding uncertain or questionable aspects of the trial court's order, including its award of attorney fees, its remedy of reducing the County's combined sales tax rate and enjoining further tax collection, its failure to provide for distribution of sales taxes already collected, and its determination of the County's liability for the Agency debts incurred in contravention of the court's order. The Court of

Appeal passed on none of these subsidiary issues, and it is appropriate that we remand for an initial determination thereof by that court, consistent with our opinion." (*Rider I, supra,* 1 Cal.4th at pp. 15-16.) Our Supreme Court thereafter remanded the matter to us with directions that we "resolve any remaining appellate contentions of the Agency and the County consistent with our opinion." (*Ibid.*) This, we hereinbelow do.

Given the particular procedural posture of the within action as it comes before us on remand, and in light of the limited nature of the issues presented for our resolution on remand, it is not necessary that we set forth in this opinion a lengthy and seamless rendition of the facts underlying the case. Such a rendition is amply set forth in *Rider I*. It suffices for the purposes of this opinion to simply set forth those portions of the trial court's judgment/order which raise the collateral issues here in question and to preliminarily note which portions of that judgment/order no longer require our attention. In pertinent part, the trial court "[o]rdered, [a]djudged and [d]ecreed" the following:

"2. (a) That AGENCY shall direct the State Board of Equalization to cease and desist collecting the 1/2% retail transactions and use tax imposed by the San Diego County Regional Justice Facility Financing Agency Ordinance only: [¶] (1) if no timely appeal is taken from this judgment, when the time for appeal has expired; or [¶] (2) if (i) a timely appeal is taken from this judgment and (ii) this judgment is affirmed by the highest court of the State of California which undertakes to review this judgment and when this judgment is no longer subject to review by the Supreme Court of California;

"(b) That Article XIIIB, Section 2 of the California Constitution may be invoked to return the sales tax collected pursuant to Proposition A [the ballot measure which actually imposed the supplemental sales tax throughout the County] should said tax be found to be invalid after all avenues of appeal have been exhausted pursuant to 2(a) above. Such taxes collected, together with interest thereon, shall be returned by reduction of the sales tax rate within San Diego County by 1-1/2% for a period of time sufficient to accrue a reduction of funds in an amount equal to the amount of tax collected prior to final judgment. Said reduction shall commence as of the end of the month in which the judgment becomes final and is subject to no further appeals pursuant to 2(a) above. Upon the accrued reduction of an amount equal to the amount of tax previously collected pursuant to Proposition A, the sales tax rate within the County of San Diego shall increase by 1% so as to revert to the rate collected prior to Proposition A.

"Taxes held by AGENCY will immediately be paid to the State Board of Equalization for distribution by the State Board of Equalization as if the

aforementioned taxes held in trust had been collected pursuant to the provisions of the Revenue and Taxation Code at such time as judgment becomes final pursuant to 2(a);

"(c) No revenues collected pursuant to the tax authorized by Proposition A, nor the interest thereon, shall be spent or disbursed by the defendants. Defendant Agency shall incur no debts or liability without first providing notice to the prospective obligee that satisfaction of the liability or debt is contingent upon the reversal of the Court's decision invalidating the tax. Defendant County shall be liable for any liabilities or debts incurred by Agency in contravention of this order;

" . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"6. The motion of Plaintiffs' [sic] and their attorneys of record for attorneys' fees pursuant to Code of Civil Procedure § 1021.5 is granted. Plaintiffs and their counsel are hereby awarded 95% of the hours requested in their fee motion, plus 100% of the hours requested in the supplemental declaration filed on June 5, 1989. The hourly rate is hereby ordered to be $150.00, with no multiplier applied. The Court has calculated this figure to be a sum in the amount of $108,295.15. This obligation is hereby ordered to be joint and several with respect to all Defendants;

"7. The Court further reserves and continues its jurisdiction over the issue of further attorney's fees and costs[.]"

With respect to the above, we note the following:

(1) All of the parties are in agreement that the collection of the supplemental sales tax was terminated by the State Board of Equalization (hereinafter, the SBE) on February 13, 1992—the date on which *Rider I* became final. Thus, the issue of whether the trial court erred in enjoining the collection of the tax is now moot.

(2) Further, all of the parties are in agreement that neither the Agency nor the County has spent or disbursed any of the collected tax funds in violation of the trial court's order. Thus, the issue of whether the trial court had the authority to preclude the Agency and/or the County from disbursing any of the collected tax funds in a manner other than that imposed by the trial court, at least until such time as the validity of the tax was finally established, is also now moot.

We now turn our attention to those collateral issues which remain for our resolution. Additional facts will be referred to, as needed, in the discussion which follows.

DISCUSSION

I.

*Disbursement of Invalidly Collected Taxes*

■ The single largest "bone of contention" remaining to be resolved in this case is the question of whether the trial court erred in ordering a "redistribution" of the invalidly collected supplemental sales tax funds pursuant to article XIII B, section 2 of the California Constitution. Guided in part by our Supreme Court's recent opinion in *Woosley* v. *State of California* (1992) 3 Cal.4th 758 [13 Cal.Rptr.2d 30, 838 P.2d 758] (hereinafter cited simply as *Woosley*), we conclude that the trial court did err in that regard and that the trial court's judgment/order must be reversed in that respect.

At the time the trial court's judgment/order was entered in 1989, article XIII B, section 2 of the California Constitution provided, in pertinent part: "(b) Except as provided in subdivision (a) of this Section, revenues received by any entity of government in excess of that amount which is appropriated by such entity in compliance with this Article during the fiscal year shall be returned by a revision of tax rates or fee schedules within the next two subsequent fiscal years."[1] The trial court apparently concluded that this constitutional provision authorized a "redistribution" of the invalidly collected supplemental sales tax to the general retail customer base of the County by way of a temporary "sales tax offset." With all due respect to the trial court, we conclude that this constitutional provision cannot be construed to authorize such a "remedy."

■ " 'The generally accepted rules for construing constitutional provisions may be summarized as follows: (1) a liberal, practical and common-sense approach should be taken, (2) the natural and ordinary meaning of the words used should be followed, (3) the apparent intent of the framers should be fulfilled and absurd results avoided, and (4) interpretations by the Legislature and administrative agencies and the ballot summary, arguments and analysis should be considered in determining the probable meaning of uncertain language. [Citation.]' [Citations.]" (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 449, fn. 3 [170 Cal.Rptr. 232].) ■ When these rules of construction are applied to article XIII B, section 2, it becomes clear that the trial court's interpretation of that constitutional provision was erroneous.

---

[1]In 1990, Proposition 111 amended article XIII B, section 2, subdivision (b) in ways that are not pertinent to our discussion of the provision here.

In a similar vein, we note that subdivision (a) of article XIII B, section 2 concerns excess state appropriations and is not concerned with the "redistribution" of local entity tax revenues.

It has long been understood that "[a]rticle XIII B was adopted less than 18 months after the addition of article XIII A to the state Constitution, and was billed as 'the next logical step to Proposition 13' " and that "the thrust of article XIII B is toward placing certain limitations on the growth of appropriations at both the state and local government level; in particular, article XIII B places limits on the authorization to expend the 'proceeds of taxes.' [Citation.]" (*County of Placer v. Corin, supra,* 113 Cal.App.3d at p. 446; see *Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 109-110 [211 Cal.Rptr. 133, 695 P.2d 220].) In short, article XIII B was designed to establish "a flexible way to provide discipline in government spending" (*County of Placer v. Corin, supra,* 113 Cal.App.3d at p. 447) by providing, in general terms (and subject to limited adjustment), that "a governmental entity may not spend more in one year on a program funded with the proceeds of taxes than it did in the prior year." (*Huntington Park Redevelopment Agency v. Martin, supra,* 38 Cal.3d at p. 107.) This general understanding of article XIII B, coupled with the fact that section 2 of the article clearly addresses only the "redistribution" of *excess* tax receipts, compels the common sense conclusion that article XIII B, section 2 applies only to the appropriation/spending authority of governmental entities which *have* tax revenues—governmental entities, in other words, which *lawfully* obtain tax receipts. In this case, however, it is now clear (under *Rider I*) that the Agency *never* had any lawful right to obtain the supplemental sales tax revenues which, under the enabling legislation creating the Agency (Gov. Code § 26250 et seq.), comprised the *sole* source of tax revenue for the Agency. Thus, article XIII B, section 2 does not apply to the Agency or to the supplemental sales tax revenues which were invalidly collected on the Agency's behalf.[2]

The question remains, then: If the invalidly collected supplemental sales tax revenues are not to be "redistributed" pursuant to article XIII B, section

[2]Leaving aside the trial court's misplaced reliance on article XIII B, section 2 as authority for a remedial "sales tax offset," there is yet another fundamental reason why such a remedy should not be applied in this case: Such a remedy would arguably run afoul of established constitutional and jurisdictional principles of law which serve to limit judicial authority. The San Diego County "combined sales tax" which was to be reduced by the trial court's order is comprised of both state and local "components." If the sales tax reduction were to be deemed to apply to the "state component," then the reduction would arguably violate the prohibition of article XIII, section 32 of the California Constitution, which provides in pertinent part that: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax." If, on the other hand, the sales tax reduction were to be deemed to apply to the "local component," then the trial court's order would serve to restrict the collection of concededly valid taxes by governmental entities which were not parties to the within action, raising fundamental questions as to the trial court's jurisdiction to act in such a manner. Although the judiciary stands ready to resolve issues of "arguable violations of the Constitution" and "fundamental questions of jurisdictional authority" when it is necessary to do so, it is the better course to leave aside the resolution of such issues in cases, such as this one, in which it is *not* necessary to do so. As

2, what is to be done with them? Our Supreme Court's opinion in *Woosley* serves as the cornerstone of our answer to that question.

In *Woosley*, our Supreme Court stated: "The California Constitution expressly provides that actions for tax refunds must be brought in the manner prescribed by the Legislature. Article XIII, section 32, of the California Constitution provides in this regard: 'After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, *in such manner as may be provided by the Legislature.*' (Italics added.) This constitutional limitation rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues. (See *State Bd. of Equalization* v. *Superior Court* (1985) 39 Cal.3d 633, 638 [217 Cal.Rptr. 238, 703 P.2d 1131].)" (*Woosley, supra*, 3 Cal.4th at p. 789.) The *Woosley* opinion then went on to observe that "[s]ection 6901 et seq. [of the Revenue and Taxation Code] governs claims for refunds of sales and use taxes. Sections 6902, subdivision (a), 6905, and 6932 provide that unless a claim for refund is filed within three years of the overpayment, no suit may be brought. (*Philips & Ober Electric Co.* v. *State Bd. of Equalization* (1991) 231 Cal.App.3d 723, 728 [282 Cal.Rptr. 338].)"[3] (3 Cal.4th at p. 790.)

Inasmuch as the invalidly collected supplemental sales tax here in question was imposed between January 1, 1989, and February 13, 1992, the three-year statute of limitations within which refund claims can be submitted to the SBE with regard to that tax is still running. Consequently, it is necessary that the invalidly collected tax revenues be retained as a refund account until such time as all claims for a refund of any of such revenues are finally settled (either administratively or judicially). Pending future judicial mandate to the contrary, if any, it is appropriate that these revenues be retained by the SBE.

At oral argument, the Taxpayers argued forcefully that *Woosley* was inapplicable to the instant case, pointing out significant distinctions between that case and this one. The distinctions noted by the Taxpayers exist, but they do not render *Woosley* any less authoritative insofar as the issues here before us are concerned. To wit:

(1) *Woosley* was a refund action brought by a taxpayer to recover a tax that had already been paid—while the instant action is a validation action

---

is explained in the main text of the opinion, equity and law are fully served in this case by the adoption of a remedial approach other than the "sales tax offset" adopted by the trial court.

[3] Section 6901 of the Revenue and Taxation Code, by its own terms, applies not only to "overpayments," but also to "any amount . . . erroneously or illegally collected."

which was brought by "interested persons" prior to the imposition of the supplemental sales tax. However, as noted above, the statute of limitations for claiming a refund of invalidly collected supplemental sales tax revenues is still running in this case—and any determination as to how to "distribute" the invalidly collected revenues must take the currently existing right of retailers to claim refunds into account.

(2) *Woosley* concerned an invalidly collected state tax—while the instant action concerns an invalidly collected local tax. However, while the refund claim sections of the Revenue and Taxation Code noted in the *Woosley* opinion (§ 6901 et seq.) are directed toward state taxes, sections 7252.11, 7261, subdivisions (a)(2) and (a)(3), and 7262, subdivisions (a)(1) and (a)(2), specifically make section 6901 et seq., applicable to any local sales (transaction) or use tax imposed by the Agency.

(3) Finally, *Woosley* concerned the right of the actual taxpayer to recover an invalidly imposed and collected tax—while the refund procedures at issue in the instant action, as a practical matter, concern only the right of "middlemen" (the *retailers*—as opposed to the "ultimate" taxpayers, the *consumers*) to recover invalidly imposed and collected sales taxes. (See *Delta Air Lines, Inc.* v. *State Bd. of Equalization* (1989) 214 Cal.App.3d 518, 526 [262 Cal.Rptr. 803].) However, as we discuss at somewhat greater length below, the mere fact that the statutory refund procedures which are here at issue relate to retailer refunds rather than to consumer refunds does *not* mean that the consumers of San Diego County are left without remedy with respect to seeking a reimbursement of the invalidly collected supplemental sales tax revenues.

The action which is before us in *this* case, as noted at the outset of the opinion, was brought pursuant to the "validation action" provisions of the Code of Civil Procedure to challenge the underlying validity of the supplemental sales tax—and the issue of the validity of that tax has now been settled. This case does not call upon us to decide, and we do not decide, any issues relating to the refund proceedings which may be undertaken to recover any invalidly collected sales tax revenues: "The well-established rule is that we should avoid advisory opinions. [Citation.]" (*Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273, 284 [10 Cal.Rptr.2d 859, 834 P.2d 119]; see *Woosley, supra,* 3 Cal.4th at p. 793.) In a similar vein, we decline to decide any issues relating to the ultimate "redistribution" of invalidly collected supplemental sales tax revenues remaining after the above referenced refund proceedings are completed, if any: Inasmuch as we cannot be sure that there will be any such remaining funds, any decision concerning the "redistribution" of such funds would be entirely speculative and conjectural.

Before leaving the issue of the "redistribution" of the invalidly collected supplemental sales tax revenues, we wish to make two observations concerning our purposefully restrained judicial response to that issue:

(a) Contrary to what the Taxpayers have implicitly suggested, neither this court nor the trial court has unfettered discretion to "fashion an equitable remedy on behalf of the retail consumers of San Diego County." The supplemental sales tax revenues at issue in this case have already been collected and paid to the SBE and, as noted in *Woosley*, the California Constitution places "strict legislative control over the manner in which tax refunds may be sought." (*Woosley, supra,* 3 Cal.4th at p. 789.)

(b) Further, and also contrary to what the Taxpayers have implicitly suggested, the mere fact that we do not herein provide a direct reimbursement remedy for the retail consumers of San Diego County does *not* mean that those consumers are without means of seeking a reimbursement of the invalidly collected supplemental sales tax revenues. It is well recognized that "[t]here have been some refinements of the rule barring suits for refund to persons not technically regarded as 'taxpayers' . . . resulting from unusual circumstances which have been subject to judicial review." (*Delta Air Lines, Inc.* v. *State Bd. of Equalization, supra,* 214 Cal.App.3d at p. 526.) Nothing said in this opinion precludes the retail consumers of San Diego County from pursuing, in another action, remedial reimbursement of the invalidly collected supplemental sales tax revenues in accord with the legal and equitable principles articulated in *Decorative Carpets, Inc.* v. *State Bd. of Equalization* (1962) 58 Cal.2d 252 [23 Cal.Rptr. 589, 373 P.2d 637], *Javor* v. *State Bd. of Equalization* (1974) 12 Cal.3d 790 [117 Cal.Rptr. 305, 527 P.2d 1153], and *Javor* v. *State Bd. of Equalization* (1977) 73 Cal.App.3d 939 [141 Cal.Rptr. 226] (disapproved on limited procedural grounds by *Woosley, supra,* 3 Cal.4th at p. 792).[4]

To summarize: We conclude that the invalidly collected supplemental sales tax revenues here in question (less the payment of certain fees and costs discussed below) must be retained by the SBE to be held available to meet refund claims (if any) made with respect to those collected taxes.[5]

---

[4]In the same vein, nothing we have said herein should be deemed as an expression of opinion as to the substantive merit or proper outcome of any such other action.

[5]We are informed by the SBE that it is currently in possession of some of the invalidly collected tax revenues, but that a significant majority of those funds have been remitted to the Agency to be held pending the final determination of the issues herein addressed. As noted and directed in the disposition set forth at the conclusion of this opinion, it will be necessary that the Agency return all of those funds (other than those otherwise disbursed in accord with this opinion) to the SBE.

## II.

### Plaintiffs' Attorney Fees

■ The trial court ordered the payment of attorney fees to the Taxpayers' attorneys under the statutory "private attorney general" provisions of section 1021.5 of the Code of Civil Procedure. While we agree with the trial court that the Taxpayers' attorneys are entitled to an award of attorney fees, we disagree with the trial court that those fees should be paid under the authority of section 1021.5 of the Code of Civil Procedure.

In order to qualify for an award of attorney fees under section 1021.5 of the Code of Civil Procedure, several distinct qualifications must be met. Of particular interest here is the final qualification set forth by the statute, qualification "(c)": "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: . . . (c) such fees should not in the interest of justice be paid out of the recovery, if any." We conclude that this last qualification is not met in the instant case.

We reach this conclusion in recognition of the following factors: (1) *Both* "sides" of the within litigation acted in good faith to uphold "the public's interest"—the Taxpayers in seeking to establish the correct interpretation and application of extant state constitutional provisions of fundamental importance, and the County and Agency in seeking to carry out (consistent with their, at the time arguably correct, interpretation of the pertinent state constitutional provisions) the will of the majority of the County voters to provide concededly needed justice facilities; and (2) the final conclusion reached by our Supreme Court in *Rider I* with respect to the proper interpretation and application to be given article XIII A, section 4 of the California Constitution was not a clear, obvious or foregone conclusion prior to the rendering of that opinion (a fact made abundantly clear by simply reading *Rider I*). These two factors lead us to conclude that the "interest of justice" mandates the payment of the Taxpayers' attorney fees from the recovered fund of invalidly collected supplemental sales tax revenues rather than from the general funds of the County and/or the Agency.

In this regard, we conclude that the Taxpayers' attorneys should be paid their reasonable attorney fees pursuant to the well-established equitable doctrine of "the common fund theory." As described by our Supreme Court in *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*): "This, the so-called 'common fund' exception to the American

rule regarding the award of attorneys fees (i.e., the rule set forth in section 1021 of our Code of Civil Procedure), is grounded in 'the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund of property itself or directly from the other parties enjoying the benefit.' [Citation.]" (20 Cal.3d at p. 35.) Our Supreme Court went on to comment on the "common fund theory" in *Serrano III* as follows: " 'Fees are awarded under this rationale out of a fund recovered or maintained by the plaintiff, on the theory that all who will participate in the fund should pay the cost of its creation or protection and that this is best achieved by taxing the fund itself for attorney's fees.' [Citation.]" (*Ibid.*, fn. 5.)

The Taxpayers' "recovery" of the invalidly collected supplemental sales tax revenues in this case, and the resultant preservation of those revenues to satisfy subsequent refund claims made against the SBE, constitutes a precise "fit" within the "common fund theory." (See *Bank of America v. Cory* (1985) 164 Cal.App.3d 66, 90-91 [210 Cal.Rptr. 351].)

In holding to a contrary position, the Taxpayers argue that there is a strong policy argument against applying the "common fund theory" in cases, such as this one, where plaintiffs seek to invalidate an illegal tax, which argument we paraphrase as follows: "The best remedy whereby to foreclose the imposition of an illegal tax is injunction. Yet, where plaintiffs' attorneys must seek their recompense from a common fund, there is a disincentive to seek to enjoin the collection of an illegal tax because a successful injunction will preclude the creation of the 'common fund' from which the attorneys will be paid." This is mere sophistry. Precisely to the extent that there would be no "recovered fund" if an injunction were to be successfully obtained against the collection of an illegal tax, there would be no occasion to consider the application of the "common fund theory" and equity might well then compel the application of the "private attorney general" theory codified in section 1021.5 of the Code of Civil Procedure in securing the payment of the fees of the successful parties' attorneys. In any event, it is not an issue we need address in this case.

To summarize: The Taxpayers' attorneys are entitled to their reasonable fees, which fees are to be paid from the "recovered fund" of invalidly collected supplemental sales tax revenues.[6] The issue of attorney fees must be remanded to the trial court to permit that court to determine whether an award of attorney fees on appeal is due the Taxpayers' attorneys in addition

---

[6]Of necessity, and for precisely the same reasons discussed above with respect to the recovery of attorney fees by the Taxpayers' attorneys, the recovered "common fund" shall

to the previously awarded "trial fees" and, if so, the appropriate amount of such additional fees. (*Security Pacific National Bank* v. *Adamo* (1983) 142 Cal.App.3d 492, 498 [191 Cal.Rptr. 134].)

### III.

### *Payment of Agency Debts and Expenses*

 As noted previously, the judgment/order entered below by the trial court contained the following order: "Defendant Agency shall incur no debts or liability without first providing notice to the prospective obligee that satisfaction of the liability or debt is contingent upon the reversal of the Court's decision invalidating the tax. Defendant County shall be liable for any liabilities or debts incurred by Agency in contravention of this order." Both the County and the Agency argue that this order exceeded the trial court's authority. We agree.

The County candidly admits that it is not aware that any such liability or debt exists; and the Agency is silent as to whether any such liability or debt exists. Nevertheless, a decision on this issue is not purely advisory inasmuch as the County's obligation under the trial court's order is actual and ongoing.

On the face of it, the Agency has a distinct and separate juridical existence, apart from that of the County, under the San Diego County Regional Justice Facility Financing Act (beginning with § 26250 of the Gov. Code)—which existence includes the power to sue and be sued (Gov. Code, § 26263), the power to employ a director and staff (Gov. Code, § 26265), the power to enter into contracts (Gov. Code, § 26266), the power to hold title to land (Gov. Code, § 26267, subd. (a)(4)) and the power to "do all things necessary or convenient to carry out the purposes of this chapter" (Gov. Code, § 26268). The fact that the County and the Agency share identical boundaries, share two "board members" in common and share certain responsibilities with respect to the administration of the Agency's duties does not diminish the Agency's separateness and distinctness as a juridical entity. (*County of Los Angeles* v. *Continental Corp.* (1952) 113 Cal.App.2d 207, 219-220 [248 P.2d 157]; see also *Riverside etc. Dist.* v. *Jos. W. Wolfskill Co.* (1957) 147 Cal.App.2d 714, 717-718 [306 P.2d 22].) Thus, absent a basis for finding that the County is somehow *derivatively* liable for the Agency's debts and liabilities, the trial court acted without authority in holding the County liable for the Agency's debts and liabilities. The Taxpayers contend that there is a basis for finding the County derivatively liable for the

also serve as the source from which the Taxpayers recover their trial costs and their costs on appeal.

Agency's debts and liabilities—arguing that the Agency is nothing more than the governmental equivalent of the "alter ego" of the County and that this "merged identity" of the two governmental entities justifies holding the County liable for the Agency's debts and liabilities. The Taxpayers' position is without merit.

■ As stated by our Supreme Court: "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. [Citation.] In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation: 'As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' [Citation.]

". . . . . . . . . . . . . . . . . . . . . . . . . .

"The essence of the alter ego doctrine is that justice be done. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.' [Citation.] Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." (*Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 300-301 [216 Cal.Rptr. 443, 702 P.2d 601].)

■ Here, both the County and the Agency acted (a) in good faith, (b) in cooperation with the Legislature, and (c) in conformity with the wishes of a majority of the voters of the County in attempting to create a lawful "mechanism" whereby to generate needed funding for justice facilities. Neither the County nor the Agency engaged in an "abuse" or a "perversion" of legislative privilege in pursuing the establishment and collection of the supplemental sales tax here in question. Consequently, equity does not demand that the County be held derivatively liable for the Agency's debts and liabilities. Absent such a demand, we conclude that the trial court erred in holding the County liable for the Agency's debts and liabilities.[7]

---

[7]Nothing said in *Rider I* compels a different conclusion. Indeed, our Supreme Court stated in that opinion: "The 'essential control' standard posited above is not necessarily the functional equivalent of the 'alter ego' theory used to 'pierce the corporate veil' for purposes of imposing liability on the individual shareholders. [Citation.] Rather than attempting to

## IV.

### *Payment of Agency's Attorney Fees*

 The Agency contends that it should, in equity, be permitted to recover an award of attorney fees from the "recovered fund" of invalidly collected supplemental sales tax revenues. In making this contention, the Agency argues, in the alternative, that three different equitable theories support the award of such fees: (1) The "private attorney general" theory; (2) the "common fund" theory; and (3) the "substantial benefit" theory. We find that none of these theories are applicable to the facts of this case insofar as a recovery of attorney fees by the Agency is concerned:

(1) The "private attorney general" theory (Code Civ. Proc., § 1021.5) provides for a recovery of attorney fees by "a successful party." However many collateral issues may have been raised in this case, *the* issue in this case was the validity of the supplemental sales tax under article XIII A, section 4 of the California Constitution. On this issue, the Agency was *not* "a successful party." Consequently, the Agency is not entitled to an award of attorney fees under the "private attorney general" theory.

(2) As discussed previously in this opinion, the "common fund" theory serves to provide a source for attorney fees for "a party preserving or recovering a fund for the benefit of others in addition to himself." (*Serrano III, supra,* 20 Cal.3d at p. 35.) Here, the fund that *was* preserved, the fund set aside for the benefit of tax refund claimants, was not preserved or recovered by the Agency—and the efforts of the Agency to preserve *another* fund, a valid fund of taxes to build justice facilities, were not successful. Thus, the Agency does not qualify for an award of attorney fees under the "common fund" theory.

(3) *Serrano III* also defined and explained the nature and applicability of the "substantial benefit" theory: "This exception [to the American rule], which may be viewed as an outgrowth of the 'common fund' doctrine, permits the award of fees when the litigant, proceeding in a representative capacity, *obtains a decision resulting in the conferral of a 'substantial benefit'* of a pecuniary or nonpecuniary nature." (20 Cal.3d at p. 38, italics added.) Here, there was no decision obtained by the Agency which resulted in the

---

demonstrate that the subject agency and county are *identical* entities, application of the 'essential control' test simply affords ground for reasonably inferring an intent to circumvent Proposition 13." (1 Cal.4th at p. 12.) An "intent to circumvent Propostition 13," while significant under "a *Rider I* analysis" to determine the validity of a local tax, is not such an "abuse" or "perversion" of legislative privilege as to call for the equitable application of the alter ego doctrine.

conferral of a substantial benefit on a represented class of persons. Consequently, the Agency is not entitled to an award of attorney fees under the "substantial benefit" theory.[8]

DISPOSITION

The judgment entered below by the trial court is, of course, affirmed insofar as it declares the supplemental sales tax invalid under article XIII A, section 4 of the California Constitution.

The judgment entered below is reversed insofar as it imposed a "sales tax offset" as the means whereby to disburse the sales tax funds invalidly collected on behalf of the Agency.

The judgment entered below is affirmed insofar as it determined that the Taxpayers' attorneys are entitled to an award of attorney fees, but it is reversed insofar as it determined that such fees are to be paid pursuant to section 1021.5 of the Code of Civil Procedure.

The judgment entered below is reversed insofar as it held the County liable for certain of the Agency debts and/or liabilities.

This matter is remanded to the superior court with directions that it:

(1) Conduct such further proceedings as are necessary and appropriate to determine the amount of attorney fees and costs recoverable by Taxpayers.

(2) Order Agency to pay, from the invalidly collected supplemental sales tax revenues currently in the possession of the Agency, those fees and costs determined pursuant to the next preceding direction to be recoverable by Taxpayers.

(3) Order all invalidly collected supplemental sales tax revenues (wherever and however held, and together with accrued interest thereon), other than the fees and costs ordered paid pursuant to the next preceding direction, be deposited with and/or retained by the SBE, pending and subject to any such administrative and/or judicial proceedings as may hereafter be undertaken with respect thereto.

(4) Conduct such further proceedings, if any, as are necessary and appropriate to carry out the views expressed in this opinion.

[8]The Agency purports to find support for its general position that it is entitled, in equity, to an award of attorney fees in *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82 [144 Cal.Rptr. 71]. Frankly, we do not find any such support in that opinion. If anything, *County of Inyo* serves as an instructive example of why the three "attorney fee theories" which are here in issue would not apply in this case.

Plaintiffs shall have their costs on appeal.

Dabney, Acting P. J., and McDaniel, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied March 25, 1993.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.